# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| ARCELORMITTAL INDIANA HARBOR LLC, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>AMEX NOOTER, LLC, )<br>    Defendant. ) | CAUSE NO.: 2:15-CV-195-PRC |

## OPINION AND ORDER

This matter is before the Court on ArcelorMittal's Motion to Compel Amex Nooter to Produce Responsive Documentation [DE 107], filed by Plaintiff ArcelorMittal Indiana Harbor LLC ("Indiana Harbor") on August 18, 2016. Defendant Amex Nooter, LLC ("Amex Nooter") filed a response on September 1, 2016, and Indiana Harbor filed a reply on September 8, 2016.

This litigation arises out of a fire and explosion that occurred at Blast Furnace No. 3 at Indiana Harbor's Harbor West Facility on April 3, 2013, when Amex Nooter was performing work for Indiana Harbor. The valve came off a live gas pipe while Korrie Griffith, an employee of Amex Nooter, was working on the pipe. Griffith's supervisor, Eric Olson, testified that he told Griffith not to touch the valve; Griffith testified that Olson told him to try to fix the valve even though it was "live." As a result of the explosion, another Amex Nooter employee was injured, and Indiana Harbor sustained property damage.

Based on information learned through the discovery process, Indiana Harbor served on Amex Nooter Its Third Set of Requests for Production of Documents on July 13, 2016. This set contained twenty requests for production that fell into three categories:

    1.    **Request for Production No. 1** - Request for production of documentation regarding a prior accident involving an Amex Nooter employee disregarding the express instructions of his supervisor by manipulating a hot water valve and causing burn injuries to another worker.

2. **Requests for Production Nos. 2 through 4** - Requests for production of documentation regarding Amex Nooter's decision in April 2013 to no longer perform work at Indiana Harbor facilities and its later proposal and work at Indiana Harbor facilities.

3. **Requests for Production Nos. 5 through 20** - Requests for production of documentation regarding a letter Amex Nooter sent to Indiana Harbor on February 22, 2013, acknowledging its internal safety and communication issues among its employees' work at ArcelorMittal.

Amex Nooter responded on August 12, 2016, objecting to the requests and producing no documents. After an unsuccessful meet and confer, Indiana Harbor filed the instant motion.

Federal Rule of Civil Procedure 26 provides that the scope of discovery is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). The Court considers each category of requested documents in turn.

*1.    Request for Production No.1*

Request for Production No. 1 asks for

> [a]ny and all documentation regarding a prior accident at ArcelorMittal's Indiana Harbor facility involving Amex Nooter and its work on a hot water line, in which an ArcelorMittal employee was injured when a valve was opened, as testified to by Eric Frahm, on pages 79 through 96 of his deposition and William Emery on pages 189 through 192 at his deposition.

(Pl. Br., Ex. H, Req. No. 1).

In his deposition, Eric Frahm, a former Amex Nooter supervisor, testified that, prior to April 3, 2013, an Amex Nooter employee opened a hot water line valve that had just been "hot tapped" and hot water came out of the valve onto a mill employee's feet and burned him. Frahm testified that

the valve should not have been opened. When asked if the employee was "not that experienced," Frahm answered, "I don't know about not experienced just went brain dead for a minute. I don't know. He just made a mistake." (Pl. Br., Ex. C, 82:16-22). Management at Amex Nooter became aware of the hot water valve incident. Frahm testified that he and the other supervisors were not part of any Amex Nooter meeting regarding valves and did not put anything into place to prevent the water incident from happening again. The employee was not disciplined.

Indiana Harbor argues that the documentation is relevant and proportional because the facts of the hot water valve incident are substantially similar to the facts leading to the April 3, 2013 incident (Pl. Br. 4-5 (citing *Milhailovich v. Laatch*, 359 F.3d 892, 908 (7th Cir. 2004) (discussing admissibility of other accidents)). In support, Indiana Harbor contends that both incidents involved (1) an Amex Nooter employee disregarding the safety instructions of a supervisor; (2) an Amex Nooter employee manipulating a valve against the instructions of the supervisor; and (3) another individual suffering severe burn injuries. Indiana Harbor further argues that the event is relevant because Amex Nooter did not put safety measures into place to prevent future occurrences following the hot water valve incident. And, Indiana Harbor suggests that these facts show that Amex Nooter had a pattern and practice of allowing employees to perform work in an unsafe manner.

"'Other accident' evidence is 'generally deemed admissible both to prove the existence of a defect or danger in a location or a product and to show that the defendant had notice of the defect or danger, so long as the other accidents are "substantially similar" to the accident at issue in the litigation.'" *Sandoval v. Bridge Terminal Trans., Inc.*, No. 14-C-639, 2015 WL 3650644, at *1 (E.D. Wis. June 10, 2015) (quoting *Mihailovich*, 359 F.3d at 908; citing *Lobermeier v. Gen. Tel. Co. of Wis.*, 349 N.W.2d 466, 476 (Wis. 1984)).

3

The hot water valve incident is not relevant to the April 3, 2013 gas valve incident. Contrary to the first two similarities asserted by Indiana Harbor, there is no evidence that the employee who opened the water valve was given safety instructions that he disregarded nor is there evidence that he disregarded supervisor instructions. And, there is conflicting testimony as to whether Griffith was told not to touch the valve or was told to fix the valve even though it was live. Although Frahm was Griffith's supervisor, he was not the supervisor during the water valve incident; rather, he was a co-worker. While both incidents involved an injury, one injury was from hot water coming from a water valve and the other was from a fire that occurred after gas escaped from a valve. Although both incidents concern "valves," the water valve incident involved the "opening" of the hot water valve whereas the description of the April 3, 2013 incident is that the valve "came off." (Def. Br., Ex. 1, 49:13-52:1). While the question before the Court is one of relevance in the context of discovery and not of admissibility at trial, other than both involving "valves," the incidents are too dissimilar for the water valve incident to be relevant.

Also, Indiana Harbor has not shown how documentation regarding the water valve incident is relevant to any claim or defense in this case. Indiana Harbor reasons that this discovery request supports a pattern and practice of allowing employees to work in an unsafe manner and that, but for Amex Nooter putting into place appropriate safety measures, the April 3, 2013 incident would not have happened. But, Indiana Harbor does not explain how training on the proper handling of a hot water valve, including not opening a hot water valve that had just been "hot tapped," would have prevented an incident involving a gas pipe valve coming off during a repair. The fact that Indiana Harbor is seeking information about a single incident does not overcome the relevance requirement.

The Court denies the Motion to Compel as to Request for Production No. 1.

2.   *Requests for Production Nos. 2 through 4*

   Requests for Production Nos. 2 through 4 seek documentation regarding Amex Nooter's decision in April 2013 to no longer perform work at Indiana Harbor facilities in contrast with its later proposal to work at Indiana Harbor facilities. Indiana Harbor argues that Amex Nooter is trying to create a "larger narrative . . . that ArcelorMittal's facility was dangerous and unsafe." (Pl. Mot. 6). In support, Indiana Harbor cites the testimony of two Amex Nooter managers.

   First, when asked what happened to a certain individual's employment with Amex Nooter following the April 3, 2013 incident, Greg Harper responded:

> What happened was I made the decision that we were no longer going to perform *this type of maintenance work out at the plant.* It was too taxing, too many man hours, too dangerous. So I asked for a meeting with Wendell Carter from ArcelorMittal and sat with him and said we'd more than willing bid any capital work that you have, but we're no longer interested in doing this type of work and that Amex Nooter will stay and finish the work to get you back up online, but after that, we're not going to do this type of work anymore.

(Pl. Br., Ex. E, 15:11-23) (emphasis added).

   Second, the following exchange occurred during James Hannon's deposition:

> Q:   It's my understanding through prior testimony that after April of 2013, you guys slowly stopped working in the mills; is that accurate?
> A:   That's correct.
> Q:   What was the reason for that?
> A:   Because we made the decision that the mills are too dangerous of a place to work and it affected us company-wide.

(Pl. Br., Ex. F., 12:15-23).

   Indiana Harbor then offers the following deposition testimony of its own employee, William Emery, Manager of Health and Safety at Indiana Harbor, (Wendell Carter was William Emery's boss) that, more than a year after the April 3, 2013 incident, Amex Nooter was seeking work at Indiana Harbor.

5

| | | |
|---|---|---|
| Q: | Now, how about after this incident of April 3, 2013, did you meet with any representatives from Amex Nooter? | |
| A: | I did. | |
| Q: | With whom did you meet? | |
| A: | I met with a gentleman named Brian Harris. | |
| Q: | Brian Harris? | |
| A: | And Jim Stalley. | |
| Q. | When did you – did you meet with them at the same time. | |
| A: | Yes. | |
| Q: | And when did you meet with them? | |
| A: | It would have been quite aways[sic]. It would have been quite some time after this event. | |
| Q: | How long, if you can recall? | |
| A: | More than a year. | |
| Q: | What was the circumstances of your meeting? | |
| A: | We had banned Amex Nooter from our plant pending a safety review and action plan requested by my boss Wendell Carter, prior to them performing any work on our plant sight [sic]." (Pl. Br., Ex. G, 173:7-10). | |
| Q: | Did they submit a safety review and action plan as requested? | |
| A: | They did. | |
| Q: | And what was the outcome? | |
| A: | I rejected it. | |

*Id*. 172:12-24, 173:1-15. Emery testified that he rejected the safety review and action plan for lack of detail. He also testified that he did not recall if Amex Nooter came back and performed any work at the plant and did not know if they were still on the banned list.

First, Indiana Harbor's own ban of Amex Nooter from its facilities belies Indiana Harbor's reasoning that this discovery is relevant. In its brief, Indiana Harbor reasoned: "If the true reason that Amex Nooter stopped working at ArcelorMittal in the months following the April 3, 2013, incident, was due to unsafe conditions, then one would expect Amex Nooter not to have later requested to perform work or actually performed work at these facilities." (Pl. Br. 6). Based on Indiana Harbor's own testimony, the true reason that Amex Nooter did not work at Indiana Harbor in the months following the April 3, 2013 incident was because Indiana Harbor banned Amex Nooter.

6

Second, Harper testified that Amex Nooter would be willing to do certain work at Indiana Harbor, namely capital work, but would not do maintenance work because it was too dangerous. Although Indiana Harbor's brief suggests that Amex Nooter later worked at Indiana Harbor, a close reading of Emery's testimony demonstrates that the "safety review and action plan" submitted by Amex Nooter was an application to return to work at Indiana Harbor in light of Amex Nooter's ban from the facility. And the application was denied. Moreover, there is no indication in Emery's testimony that Amex Nooter was applying to do maintenance work that would contradict Harper's testimony. Indiana Harbor has not offered any evidence, including the "safety review and action plan," to show that Amex Nooter sought maintenance work at Indiana Harbor. Indiana Harbor has not offered any evidence to show that Amex Nooter changed its position regarding its decision not to do maintenance work at Indiana Harbor.

Finally, Indiana Harbor has not shown how this request is relevant to the issues in the Amended Complaint, which are Indiana Harbor's allegations of negligence, defense of the related Swimline action, and breach of contract, or relevant to the Answer. Whether, after the April 3, 2013 incident, Amex Nooter thought that doing maintenance work at the Indiana Harbor facility was dangerous is not evidence that the Indiana Harbor facility was in fact dangerous at the time of the April 3, 2013 incident. The Court denies the motion as to Requests for Production No. 2 through 4.

3. *Requests for Production Nos. 5 through 20*

In a February 22, 2013 letter to William Emery at Indiana Harbor, Jim Stalley, the Corporate Safety Director for Amex Nooter, made the following statements:

> It was a pleasure to meet with you and Veronica last week to discuss several incidents that you had concerns about.

7

> Amex Nooter takes great pride in offering its customers quality work done safely, so any time a problem is perceived.[sic] Amex appreciates the opportunity to meet and discuss the issues.
>
> Amex Nooter conducted a safety meeting with its supervisory personnel and reviewed ArcelorMittal's expectations for safely working at their facility.
>
> Special emphasis was placed on establishing and maintaining better channels of communication not only between Amex and ArcelorMittal, but also between our people, especially when there is a change of personnel during the execution of work.

(Exhibit D) (emphasis added).

Documents related to these statements in the letter are relevant to Indiana Harbor's allegations that Amex Nooter had a pattern and practice of allowing its employees to perform work in an unsafe manner; allowing its employees to disregard Amex Nooter's own safety handbook; failing to monitor its supervisors and employees; failing to establish proper communication channels for job instructions; allowing its employees to disregard the instructions provided by their supervisors; failing to properly train its employees; and failing to follow applicable OSHA and IOSHA regulations. (Am. Compl. ¶¶ 16-17, 20-22, 29-30). Thus, the Court grants the Motion to Compel as to Requests for Production Nos. 5, 6, 7, 15, 16, 17, and 20.

However, the Court denies the Motion to Compel as to Requests for Production Nos. 8, 9, 10, 11, 12, 13, 14, 18, and 19 because they are specific to subsequent statements in the letter related to "Confined Space" issues. After the above-quoted opening paragraphs, the letter provides: "Also, it seemed as if Confined Space work has been an issue. Amex agrees that your concerns are real." (Pl. Br., Ex. D, 1). As quoted by Indiana Harbor in its motion, the letter goes on to provide: "We feel that the problem is inadequate specialized training due to the volume of workers coming aboard in such a short period." and "Amex Nooter realizes that this is only one step towards a safer work site." *Id*. at 1-2. This second sentence comes after a proposal by Amex Nooter, which Indiana Harbor does

not quote in its motion, to "contract all Confined Space Attendant work out to a third party vendor to ensure compliance with all ArcelorMittal and OSHA requirements for safe entry." *Id*. at 2. Thus, the two statements quoted by Indiana Harbor are related to "Confined Space" issues.

Amex Nooter objects that the discovery regarding "Confined Space" is not relevant because the April 3, 2013 incident did not concern a "Confined Space" as that term is defined in the industry. In neither the motion nor the reply brief does Indiana Harbor argue that the April 3, 2013 incident involved a "Confined Space." Accordingly, discovery related to the statements in the letter regarding "Confined Space" work is not relevant.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part and DENIES in part** ArcelorMittal's Motion to Compel Amex Nooter to Produce Responsive Documentation [DE 107]. The Court **ORDERS** Defendant Amex Nooter to provide documents responsive to Requests for Production Nos. 5, 6, 7, 15, 16, 17, and 20 on or before **October 3, 2016**.

SO ORDERED this 19th day of September, 2016.

        s/ Paul R. Cherry
        MAGISTRATE JUDGE PAUL R. CHERRY
        UNITED STATES DISTRICT COURT