**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

|  |  |  |
|---|---|---|
| ARCELORMITTAL INDIANA HARBOR LLC and ARCELORMITTAL USA LLC, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CAUSE NO.: 2:15-CV-195-PRC |
| AMEX NOOTER, LLC, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on (1) Plaintiffs' Motion to Exclude Opinion Testimony of Richard Parry [DE 145], filed by Plaintiffs ArcelorMittal Indiana Harbor LLC and ArcelorMittal USA LLC (collectively "ArcelorMittal"); (2) Plaintiffs' Motion to Exclude the Opinion Testimony of Ronald Pape [DE 146]; (3) Plaintiffs' Motion to Exclude the Opinion Testimony of Clifford Bigelow [DE 147]; (4) Plaintiffs' Motion to Exclude the Opinion Testimony of Ross Smith [DE 148]; (5) Amex Nooter, LLC's Motion to Exclude Testimony of ArcelorMittal's Designated Testifying Expert Donald J. Hoffmann [DE 144 and 151], filed by Defendant Amex Nooter, LLC ("Amex Nooter") and (6) Defendant Amex Nooter, LLC's Motion to Strike Hearsay Statements [DE 152]. The motions were all fully briefed on November 16, 2017.

On April 3, 2013, a fire occurred at Blast Furnace No. 3, a part of ArcelorMittal's Indiana Harbor Facility, while Amex Nooter employees Korrie Griffith and Robert Swimline were rebuilding the excess gas bleeder pilot burner cabinets pursuant to a contract between ArcelorMittal and Amex Nooter. As Griffith and Swimline were working, natural gas was released from the system and ignited. In the Amended Complaint brought against Amex Nooter based on theories of negligence and breach of contract, ArcelorMittal seeks approximately $3.2 million in property damage and excess fuel costs as a result of the fire. Discovery is closed, and ArcelorMittal's Motion

for Summary Judgment is fully briefed and pending. The Court considers each of these evidentiary motions prior to ruling on the Motion for Summary Judgment by separate order.

**A. Defendant Amex Nooter, LLC's Motion to Strike Hearsay Statements**

In this motion, Amex Nooter asks the Court to strike from ArcelorMittal's Brief in Support of its Motion for Summary Judgment hearsay statements of Eric Frahm made during the course of Frahm's deposition.

At his February 29, 2016 deposition, which counsel for Amex Nooter attended, Eric Frahm testified regarding statements made to him by Korrie Griffith immediately following the April 3, 2013 fire, when both Frahm and Griffith were Amex Nooter employees:

> Q. Did you hear Korrie Griffith say anything when you [saw] him?
> A. Oh, yeah.
> Q. What did he say?
> A. Well, first when he comes down, I get back down stopping it, Ray's got him because he's trying to take off. He goes I can't pass the piss test, I can't pass the piss test, this is my fault. I did this, I did this. I just killed a guy. I just killed a guy.
> Q. You heard –
> A. Korrie say that, yeah.
> Q. – Korrie say I can't pass the piss test?
> A. Yeah, I heard him. The two ambulance drivers heard him and Ray heard him.
>
> . . . .
>
> Q. So do you have any evidence as we sit here today, I'm just asking, do you have any direct knowledge that Korrie actually changed the valve out on the fly or is that –
> A. Besides him telling me did it?
> Q. So he told you that?
> A. Yeah.
> Q. What did he say exactly?
> A. He said I fucked up. I thought I could do it on the fly.
> Q. That's what he told you?
> A. Yeah.
> Q. And that's what you observed–that's what you heard immediately after the accident?

A.      Yeah, because he's freaking out and he can't pass the drug test. He goes, I killed a guy. Oh, my God, I killed a guy. He goes, I tried to do it on the fly. I fucked up, I fucked up, I fucked up.

(ECF 143-9, pp. 18:3-17, 42:16-43:10).

Amex Nooter argues that Eric Frahm's deposition testimony should be stricken because (1) Frahm's statements were made during a deposition and thus are out-of-court statements being offered for the truth of the matter asserted and, (2) as a former employee at the time of his deposition, Frahm's statements do not constitute non-hearsay under Federal Rule of Evidence 801(d)(2)(C). Notably, Amex Nooter is *not* arguing that Korrie Griffith's statements made after the fire and repeated in Frahm's deposition testimony are themselves hearsay. Essentially, Amex Nooter is arguing that deposition testimony of a former employee cannot be used on summary judgment.

Although a deposition transcript is not usually admissible at trial, it may be used in support of summary judgment. The Seventh Circuit Court of Appeals has explained that "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, *except that* affidavits and depositions, which . . . are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (internal citations omitted) (emphasis added). Likewise, Federal Rule of Civil Procedure 56(c) provides, in relevant part:

**(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
**(A)** citing to particular parts of materials in the record, *including depositions*, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . .

Fed. R. Civ. P. 56(c)(1)(A) (emphasis added).

Amex Nooter does not argue that Eric Frahm would be unable to give the same testimony during trial. Thus, the use of Eric Frahm's deposition testimony in support of ArcelorMittal's Motion for Summary Judgment is proper, whether or not he was an employee at the time of the deposition. The Court denies Defendant Amex Nooter, LLC's Motion to Strike Hearsay Statements.

## B. Motions to Exclude

The five pending motions to exclude expert witness opinion testimony are governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 is interpreted by the United States Supreme Court as "a flexible standard that boils down to two over-arching requirements for expert witness testimony," namely that the "expert testimony must be 'ground[ed] in the methods and procedures of science' and must 'assist the trier of fact to understand or determine a fact in issue.'" *Krik*, 870 F.3d at 674 (quoting *Daubert*, 509 U.S. at 590-02). In its role as an evidentiary gatekeeper, a trial judge must make a preliminary assessment that the testimony's underlying reasoning or methodology is scientifically valid and properly applies to the facts at issue. *Id.* (citing *Daubert*, 509 U.S. at 592-93).

In this judicial circuit, to determine the reliability of a qualified expert's testimony under *Daubert*, the trial judge considers, among other things, "(1) whether the proffered theory can be and

has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Id*. (quoting *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017); *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)). The factors are to be applied "flexibly as the case requires." *Id*. (citing *United States v. Brumley*, 217 F.3d 905, 911 (2000). "The party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the [*Daubert*] standard by a preponderance of the evidence." *Id*. The Court considers each motion in turn.

*1.*     *Plaintiffs' Motion to Exclude Opinion Testimony of Richard Parry*

Amex Nooter's expert witness Richard Parry has over fifty years of experience as an engineer, has worked extensively in the fields of safety regulations and safety procedures, and has served on numerous OSHA Safety Advisory Committees. He also worked on the development of ANSI/ASME safety codes and standards. Parry was retained by Amex Nooter to provide analysis and opinions regarding ArcelorMittal's failure to follow process management industry standards, customs, and practices in relation to the April 3, 2013 fire.

In the opening paragraph of his report, Parry opines that ArcelorMittal's allegation in the Amended Complaint that Amex Nooter's "improper conduct" was the sole cause of the April 3, 2013 fire, ensuing property damage, and costs associated with resuming production is "fallacious as the root causes of the accident/fire and property damages, were a direct result of ArcelorMittal's 'improper conduct' as it relates to following IOSHA/OSHA directives for providing and maintaining a safe workplace." (ECF 145-1, pp. 1-2). After summarizing the facts, Parry stated that he reached his conclusions and opinions

[b]ased upon a site inspection on November 23, 2015, review of depositions, accident statements/reports, drawings, equipment specifications, OSHA regulations, plaintiff's expert report, and other materials furnished to date (see attached log), as well as my work with OSHA, ANSI and ASME safety standards plus experience working as, training and supervising pipefitters . . . .

(ECF 145-1, p. 5). He then gave four numbered opinions, with the first opinion containing four subparts, which the Court summarizes as follows:

1. The root cause of the accident was ArcelorMittal's failure to install and maintain a safe/functional gas supply system because (A) there was no header shutoff valve in the feed line to the H3/H4 igniter cabinet; (B) ArcelorMittal failed to maintain, consistent with OSHA safety standard 1910.119(j), the mechanical integrity of its high pressure natural gas supply system related to the shutoff valves; (C) ArcelorMittal failed to check or test the shutoff valves prior to the April 2013 scheduled outage; (D) when dealing with high pressure gas, the "accepted good engineering practice" is to use a "double block and bleed" isolation methodology, but because of the condition of the natural gas supply system, Amex Nooter had to rely on a single shutoff valve during the April 3, 2013 fire, which proved unreliable, and, had a double block and bleed isolation been used, the opening of the line between the union and "3J" valve would not have resulted in any gas release and/or fire.

2. In the preplanning phase, the salamander heater was "missed" by ArcelorMittal. The salamander heater should have been shut-off and moved to storage a month before the scheduled outage or, at the very least, identified by ArcelorMittal and shutoff prior to the work. Despite maintenance programs and pre-job planning procedures in place, ArcelorMittal failed to implement its procedures.

3. The failure of ArcelorMittal to label and convey the magnitude of its high pressure gas line was a contributing factor in this incident.

4. "The defective shutoff valves delayed suppression of the fire which substantially added to the equipment damages and related downtime. Most all of the electrical system damage was directly proportional to the length of time it required for the main gas line to be shutoff and the stored fuel to dissipate. Had the supply of fuel been stopped shortly after the initial flash-back, outside of some minor paint damage, the electrical system would have likely remained intact and functional."

(ECF 145-1, pp. 4-8).

In its motion, ArcelorMittal raises four issues with Parry's opinion. The Court considers each in turn. First, ArcelorMittal argues that Parry is not qualified to opine on fire causation and origin and that his opinions on fire causation and origin are unreliable and will not assist the trier of fact. "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Parry admitted in his deposition that he is not an expert in fire cause and origin. Nevertheless, in the "Summary of Facts" section of his report, he wrote: "Even though the gas was escaping on an open-air deck, there was, located behind a wind break about 10 to 15 feet away, a salamander heater which ArcelorMittal maintenance personnel had failed to shutoff/remove. As soon as the gas reached the heater, there was ignition and a flash-back to the open gas line." (ECF 145-1, p. 3). However, there is a question of fact as to how the fire ignited. Thus, it appears that Parry assumed based on some witness testimony that the natural gas

was ignited by the salamander heater. Because he is not qualified to offer an opinion on the ignition source of the fire, the Court strikes from Parry's report any statement or conclusion that the gas was ignited by the salamander heater. Moreover, his assumption that the salamander heater was the ignition source is based only on speculation, unsupported by citation to any evidence or testing in his report; his unqualified, subjective belief is insufficient.

In contrast, Parry is qualified to opine that the failure to shut off and move the salamander heater created a hazard. In terms of his experience as an engineer working in the fields of safety regulations and safety procedures, he is qualified to opine on the steps ArcelorMittal should have taken in preparation for the work on the excess gas bleeder pilot burner cabinets. Notably, other qualified experts have opined in this matter either that the salamander heater was the ignition source or that the salamander heater was one of several possible ignition sources. Thus, his opinion is relevant and will assist the trier of fact.

In this same section, ArcelorMittal mischaracterizes Parry as having "outright disregarded the testimony of Mr. Griffith, Mr. Stalley, and Mr. Frahm that Mr. Griffith intentionally removed the valve" in giving his opinions. (ECF 145, p. 5). This is incorrect. Parry testified in detail regarding three possible scenarios for how the valve became separated from the pipe, allowing the natural gas to leak. In doing so, Parry specifically acknowledged the testimony that Griffith intentionally removed the valve in the context of the third scenario but then testified that he found the second scenario most plausible, giving extensive testimony as to the basis of that opinion. (ECF 145-2, pp. 30:13-44:10). ArcelorMittal does not challenge this testimony. Parry's decision not to rely on the testimony that Griffith intentionally removed the valve, which supports the third scenario, goes to the weight of the testimony and not its admissibility. The Court also cautions that

ArcelorMittal characterizes Parry's testimony about the cause of the *gas leak* as going to the "cause of the fire." (ECF 145, p. 5). However, the cause of the gas leak and the source of the ignition are separate factual determinations. Not surprisingly, ArcelorMittal does not challenge Parry's qualifications to opine on the cause of the gas leak as Parry states in his report that he has experience working as a pipefitter as well as training and supervising pipefitters.

Second, ArcelorMittal argues that Parry's opinions on the extent of the damage caused by the delay in shutting off the natural gas should be barred. The Court agrees on the basis that Parry offered no calculations to support his opinion on the extent of the damage, which appears to be based only on conjecture, or, at best, logic. ArcelorMittal employee Robert Enghofer testified in his deposition that, after the fire started on April 3, 2013, he first closed the main shutoff valve, saw that the fire continued, and then closed a second shut off valve. (ECF 145-8, pp. 134:1-10). Enghofer provided no time frame for how long these actions took. Parry admitted in his deposition that there was no evidence on precisely how long it took for the gas to be shut off after the fire started. When asked, "How long would the fire had to have been going for it to have damaged the electrical equipment?", Parry answered, "I don't know, but it went longer than it needed to go or should have gone." (ECF 146-2, pp. 117:9-12). Parry testified that he is not an expert in thermodynamics but that his opinion is based on experience. Parry explains that he arrived at this opinion by considering factors such as how hot the fire must have been burning based on its color, on the fact that the sheet metal was not buckled and was reused, and that plastic was melted throughout the scene. Nevertheless, "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other

fields of human inquiry." *Daubert*, 509 U.S. at 593 (citation omitted). Parry did not do any such testing or calculations in relation to the rate and destructiveness of the fire.

Because ArcelorMittal does not challenge Parry's opinion that the shutoff valves were defective *or* that the defect delayed suppression of the fire, the Court does not strike that opinion in the first sentence of opinion 4 of his report, and Parry may testify regarding any defect with the shutoff valves and that the defect caused a delay. However, Parry has no basis for opining that the delay caused by the defective shutoff valves "substantially added to the equipment damage and related downtime." (ECF 145-1, p. 7). The Court strikes this quoted portion of opinion 4 of Parry's expert report and the remainder of opinion 4 regarding the extent of damages due to the delay.

Third, ArcelorMittal argues that Parry's opinion given at his deposition that ArcelorMittal "intentionally destroyed evidence" should be barred. Frank Peters, an ArcelorMittal employee, testified that the valve that Griffith removed and the attached piping were ultimately placed in his office for preservation purposes, that a few hours later the items were no longer in his office, and that he does not know who took them. (ECF 145-9, p. 191:8-20). In his own deposition, Parry testified that ArcelorMittal "intentionally" destroyed the valve and piping. And yet, he admitted that he saw no evidence that anyone intentionally destroyed or discarded the valve and piping and that the evidence showed that ArcelorMittal tried to preserve evidence. Parry's opinion that the items were "intentionally" destroyed is his own speculative personal belief that ArcelorMittal employees were trying to hide the condition of the piping. (ECF 145-2, p. 74:2-19). Contrary to Amex Nooter's assertion in its response brief, whether ArcelorMittal "intentionally" disposed of the valve and related piping is a disputed fact for the trier of fact. The Court orders that Parry is barred from testifying that ArcelorMittal "intentionally destroyed evidence."

Fourth, ArcelorMittal argues that Parry cannot offer opinions about ArcelorMittal's legal duty. "Rules 702 and 704 'prohibit experts from offering opinions about legal issues that will determine the outcome of a case.'" *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012) (affirming the NLRB's exclusion of expert testimony that consisted of legal conclusions regarding Wisconsin law that the ALJ was capable of interpreting without expert opinion (quoting *United States v. Sinclair*, 74 F.3d 753, 757 n. 1 (7th Cir. 1996); *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming the district court's ruling that a law professor couldn't testify to conclusions that the city's actions violated the Fair Housing Amendments Act))). However, "[t]here is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards." *Noffsinger v. Valspar Corp.*, No. 09 C 916, 2012 WL 895496, at *7 (N.D. Ill. Mar. 15, 2012) (quoting *Richman v. Sheahan*, 415 F. Supp. 2d 929, 945 (N.D. Ill. 2006) (citing *Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994); *Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996))).

ArcelorMittal argues that Parry is attempting to change ArcelorMittal's legal duty of care through the misapplication of OSHA regulations in three opinions, which ArcelorMittal describes as:

> -ArcelorMittal had a duty to provide Amex Nooter with a safe workplace and could not delegate that responsibility to Amex Nooter. (Exhibit B, 62:13-63:18).
>
> -ArcelorMittal's failure to follow OSHA and IOSHA directives were the root cause of the fire. (Exhibit A, pp. 1-2).
>
> -ArcelorMittal failed to maintain its valves in accordance with OSHA safety standard 29 CFR § 1910.119. (Exhibit B, 85:19-87:24; 90:11-19).

(ECF 145, p. 9).

As to the first statement, Parry does not use the word "duty" in his deposition testimony. Rather, he testified that ArcelorMittal had a "responsibility to make the work area safe" and did not do so with respect to the valve. (ECF 145-2, p. 62:13-63:18). However, he testifies that ArcelorMittal "had a responsibility that they can't delegate to anybody else under the OSHA rules to provide a safe workplace physically." (ECF 14502, p. 63:16-18). Nevertheless, read in context, Parry is not testifying about ArcelorMittal's legal duty, which is governed in this diversity lawsuit for negligence and breach of contract by Indiana common law. Rather, Parry is testifying that ArcelorMittal did not meet the standards it was held to under OSHA, which is information the trier of fact can use to determine whether ArcelorMittal breached any legal duty.

As for the second statement, as discussed above, this is a causation opinion that Parry is qualified to give and does not concern a legal duty but whether ArcelorMittal met applicable professional standards. The Court denies the motion as to this second statement.

As for the third statement based on 29 C.F.R. § 1910.119, which Parry also references in his report at opinion 1.B, Parry admitted in his deposition that 29 C.F.R. § 1910.119 did not apply to ArcelorMittal. As a result, the Court grants the motion as to this regulation and strikes Parry's opinion that ArcelorMittal failed to maintain its valves in accordance with OSHA safety standard 29 C.F.R. § 1910.119. However, this does not prevent Parry from opining on the condition of the high pressure natural gas supply system, ArcelorMittal's own ongoing preventative maintenance program and its compliance with the program, the failure of several of the system's critical shutoff valves, and the consequences of that failure.

Finally, ArcelorMittal attempts to argue that there is no support for "Parry's opinion on the maintenance of the natural gas system and the use of double block and bleed" on the basis that Parry

does not rely on OSHA standards. As noted by ArcelorMittal, Parry opined in his report that ArcelorMittal was required to use a "double block and bleed" on page 6 of his report. (ECF 145-1, p. 6). He further opined that to do so is "the accepted good engineering practice," which ArcelorMittal fails to note. Parry's report is consistent with his deposition testimony that "[t]he common practice is double block and bleed on high pressure gas" and is "good engineering practice." (ECF 145-2, p. 81:7-8, 17). ArcelorMittal attempts to create a conflict by noting that Parry testified that double block and bleed is not an "OSHA requirement" or a "requirement" at all. (ECF 145, p. 11 (citing ECF 145-2, pp. 81:13-16, 95:10-20)). However, Parry testifies that it is an industry custom for the safe performance of the job. Parry is qualified to give this opinion and it will assist the trier of fact in understanding the issues related to the release of gas involved in the fire.

Based on the foregoing, the Court grants in part and denies in part the Motion to Exclude the Opinion Testimony of Richard Parry.

2.      *Plaintiffs' Motion to Exclude the Opinion Testimony of Ronald Pape*

Amex Nooter's expert witness Dr. Ronald Pape, Ph.D., P.E., CFEI was hired to identify the ignition source that ignited the natural gas that was released from the gas line during Amex Nooter's work on April 3, 2013. Dr. Pape has over 43 years of experience in explosion and fire investigation with an emphasis in areas including explosion effects, ignition testing, electrostatic hazards, chemical reaction, detonation and combustion phenomena, fire modeling, dispersion modeling, hazard analysis, hazard classification, heat transfer, fluid dynamics, and thermodynamics. He has a Ph.D. in chemical engineering, a Master of Science degree in mechanical engineering, and a Bachelor of Science degree in aeronautical and astronomical engineering. Dr. Pape determined that

"more likely than not" the ignition source for the April 3, 2013 fire was an undisclosed salamander heater.

ArcelorMittal does not contest Dr. Pape's qualifications. Rather, ArcelorMittal argues that Dr. Pape offers no expertise that would assist the trier of fact because lay witnesses testified with certainty that the salamander heater was the ignition source, whereas Dr. Pape could not opine with certainty as to what ignited the natural gas on April 3, 2013, nor could he rule out other potential ignition sources, including a grinder, other electrical components, and activity of nearby scaffolding workers. More specifically, ArcelorMittal argues that Dr. Pape's opinion testimony is unnecessarily cumulative of the fact witnesses most knowledgeable about the work that caused the fire.

On four occasions in the aftermath of the April 3, 2013 fire, Amex Nooter employees reported that the ignition source was the salamander heater. In the immediate aftermath of the fire, Amex Nooter produced an accident investigation report identifying the ignition source as an "open flamed salamander behind [a] wall 10' away." (ECF 146-3). On April 8, 2013, Ray Smith, an Amex Nooter Superintendent who oversaw the Amex Nooter work that led to the fire wrote that the escaped natural gas "was ignited by [a] heater behind a nearby wall." (ECF 146-4, p. 4). Erik Olson, the Amex Nooter foreman overseeing the work that led to the fire wrote that natural gas "spread to the heater behind [the] wall and ignited." (ECF 146-5). And, less than two months after the fire, James Stalley, Amex Nooter's Safety Director, told IOSHA that the natural gas was ignited by a space heater. (ECF 146-2, p. 2). It is not clear from the facts presented in the instant motion how these witnesses came to the conclusion that the salamander heater ignited the natural gas.

However, Dr. Pape did a scientific evaluation to reach his conclusion that the salamander heater was the likely ignition source based on a reasonable degree of engineering certainty. His 22-

page report contains an analysis of facts and data, a discussion of the fire scene and the instrumentalities involved, calculations as to the fire dynamics, and an extensive discussion of potential causes of the fire. Thus, Dr. Pape's scientifically-based opinion is not cumulative of the lay witness opinion testimony. The fact, highlighted by ArcelorMittal, that Dr. Pape has not been to the fire scene goes only to the weight of his testimony.

Second, ArcelorMittal argues that Dr. Pape's opinion should be excluded because he opined on several "potential" ignition sources, including the salamander heater, which ArcelorMittal argues contradicts the definitive statements of Amex Nooter's own employees that the ignition source was the salamander heater. A careful reading of Dr. Pape's report shows that, in arriving at his conclusion regarding the salamander heater, he considered and then *excluded as unlikely* the other possible ignition sources, specifically the hot metal wall near the space heater, the wheel cutter (grinder), electrical components, workers on a scaffold, and a valve actuator. *See* (ECF 146-1, pp. 9-14). "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert's* relevance requirement." *Smith*, 215 F.3d at 718-19 (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000)). Dr. Pape's opinions are based on scientific analysis—not mere speculation—and will assist the trier of fact. *Id*. at 719.

Accordingly, the Court denies the Motion to Exclude the Opinion Testimony of Ronald Pape.

*3.     Plaintiffs' Motion to Exclude the Opinion Testimony of Clifford Bigelow*

Clifford C. Bigelow, P.E. is a metallurgist and Certified Fire & Explosion Investigator (CFEI). He has over twenty-eight years of engineering experience in the fields of failure analysis, metallurgy, materials and mechanical engineering, and accident investigation. Bigelow is active in

the investigation of industrial fires and explosions and of fire cause analysis of fuel gas systems, and he specializes in the laboratory analysis of materials in fire cause determinations. Amex Nooter has designated him as a testifying expert witness on the prejudice Amex Nooter suffered as a result of ArcelorMittal's disposal and loss of physical evidence from the fire that is central to a scientific determination of the cause of the April 3, 2013 fire and to an objective assessment of responsibility for the April 3, 2013 fire.

Bigelow opined that ArcelorMittal's post-accident actions restricted Amex Nooter's ability to objectively investigate the cause and origin of the April 3, 2013 fire. More specifically, Bigelow opined that there was a scientific and evidentiary value to discarded artifacts, coming to four numbered conclusions at the end of his 19-page report:

1.  Amex Nooter was not permitted access to the fire scene to conduct its own technical inspection prior to the clean-up and alteration of the fire scene by ArcelorMittal; and this lack of access deprived Amex Nooter of the opportunity to perform proper examination, documentation and artifact collection at the fire scene as needed to develop and support conclusions in its investigation.

2.  ArcelorMittal had instructed that physical evidence and artifacts from the fire scene be removed and discarded before allowing Amex Nooter the opportunity to inspect and document that evidence. The removed evidence and artifacts, if examined and analyzed by those with appropriate expertise, could have contained significant information to assist Amex Nooter in forming its own conclusions as to the origin and cause of the fire, and help in the assessment of responsibility for the fire.

3.  Sufficient fire scene inspection, investigation, documentation and evidence preservation was not performed by ArcelorMittal to prove and support its identified cause of the fire. Its investigation was not adequate for Amex Nooter to rely upon in conducting its own objective investigation to determine the origin and cause of the fire, contributing factors of the fire cause and fire spread, and assess responsibility.

4.  ArcelorMittal spoliated evidence, but knew or should have known that proper documentation of the fire scene, and collection, documentation and

> preservation of physical evidence was required to support its claims of the fire cause and origin, and for other involved parties, such as Amex Nooter, to conduct their own, objective investigation of the incident.

(ECF 147-1, p. 20). ArcelorMittal does not question Bigelow's credentials, knowledge, or experience but rather raises objections to certain portions of his opinion.

First, ArcelorMittal argues that the statement in conclusion 4 that "ArcelorMittal spoliated evidence" is "a thinly veiled attempt by Amex Nooter to provide expert opinion that ArcelorMittal spoliated evidence," which is barred by Rules 702 and 704 as this is a legal opinion that affects the outcome of the case.(ECF 147, p. 1). Spoliation of evidence is typically a determination made by the Court in response to a party's request for sanctions. *See, e.g.*, *J.S. Sweet Co., Inc. v. Sika Chem. Corp.*, 400 F.3d 1028 (7th Cir. 2005); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008). It does not appear, in the context of his entire opinion, that Bigelow is attempting to make a conclusion as to the legal theory of spoliation, as Bigelow does not opine as to ArcelorMittal's "intent" in discarding the artifacts, in cleaning up the fire scene, in recovering items from the trash pile, and in keeping what it recovered from the trash pile. It may be that he used the word "spoliated" as a shorthand for "destroyed/failed to maintain evidence." Nevertheless, the phrase "ArcelorMittal spoliated evidence" sounds like a conclusion on the legal theory of spoliation. Thus, the Court grants the motion to the limited extent Bigelow employs this phrase and strikes the words "spoliated evidence, but" from his report. Bigelow is also barred from testifying that ArcelorMittal "spoliated" evidence. This ruling does not prevent Bigelow from giving any of the other opinions contained in his report, including regarding how ArcelorMittal handled the fire scene and evidence and ArcelorMittal's compliance with the applicable professional standards.

Second, ArcelorMittal argues that Bigelow's opinions are unreliable because Bigelow ignored established evidence to craft a narrative of spoliation. ArcelorMittal first points to the deposition testimony of Amex Nooter's experts Parry and Dr. Pape. ArcelorMittal notes that Parry testified that there is no evidence of intentional destruction regarding the fire scene. But this testimony is nothing more than *Parry*'s understanding of the evidence of record and is not relevant to the admissibility of Bigelow's opinion. As for ArcelorMittal's reference to Dr. Pape's testimony, it is unclear what argument ArcelorMittal is attempting to make. *See* (ECF 147, p. 6). However, ArcelorMittal does not argue that Dr. Pape's opinion is inconsistent with Bigelow's.

ArcelorMittal then points to the deposition testimony of Griffith and Stalley that Griffith intentionally removed the isolation valve, which ArcelorMittal believes is relevant, and that Bigelow failed to consider this testimony in forming his opinions. ArcelorMittal contends that, instead of considering this testimony, Bigelow focused on the lack of "physical evidence" supporting Griffith's testimony, and notes that Bigelow opined that the missing valve and pipe "possibly" could show the valve was not intentionally removed by Griffith. However, a review of Bigelow's report and his deposition testimony shows that Bigelow identified multiple theories about the fire and the disengagement of the valve and then opined as to what the discarded, destroyed, and lost artifacts from the fire scene could have revealed in relation to those theories. More specifically, Bigelow identified the questions and disputed factual information that cannot be verified from the available photographic evidence and other documentation, describing in scientific and technical detail the methodologies and analyses that should have been performed to answer the questions and resolve disputed factual issues. Unlike the cases cited by ArcelorMittal in Section 3 of its brief, Bigelow did not "cherry pick" data that he wanted to use. The fact that Bigelow's opinion downplays Griffith's

testimony and addresses the alternate theories goes to the weight of his opinion and not its admissibility.

Third, ArcelorMittal argues that Bigelow ignored the fact that Amex Nooter was not deprived of the chance to inspect the pipe because Amex Nooter inspected and documented the scene of the occurrence and the equipment at the scene within twenty-four hours of the occurrence. ArcelorMittal notes that there is witness testimony that artifacts of the fire, including the valve that Griffith removed, were present and available during Amex Nooter's inspection. Without citation to evidence, ArcelorMittal asserts that "[t]he accident scene was simply *not* cleaned up in the sense of evidence at the site being discarded the night of the incident." (ECF 147, p. 7). Bigelow does not ignore this evidence that Amex Nooter was able to inspect the scene the following morning or that Amex Nooter took pictures at that time. However, Bigelow's opinion is based on the fact that, by the time Amex Nooter representatives arrived the following morning, the scene had already been cleaned up and modified and the artifacts discarded. In its response brief, Amex Nooter notes that there is other evidence that brings into question whether the valve and pipe that were recovered by ArcelorMittal the following morning, made available to Amex Nooter, and then disappeared were in fact the valve that Griffith removed and the attached pipe, as there were several valves at the scene. Moreover, Bigelow's opinion is not limited to the valve and the pipe. He also opines extensively about the fire scene itself and the prompt cleanup in the aftermath of the fire before Amex Nooter had an opportunity to inspect the scene. Bigelow did not ignore the evidence.

Based on the foregoing, the Court grants in part and denies in part the Motion to Exclude the Opinion Testimony of Clifford Bigelow.

*4.      Plaintiffs' Motion to Exclude the Opinion Testimony of Ross Smith*

Amex Nooter retained expert witness Ross V. Smith, an occupational and health safety professional. Smith has a Bachelor of Science degree in biology and a Master's Degree in industrial hygiene and has over twenty years of experience in occupational health and safety. Smith has developed and implemented safety and health programs for fully integrated steel making facilities and multidisciplinary engineering and manufacturing operations specializing in electrical, mechanical, and engineered material components for national defense systems. As a health and safety professional, Smith has performed exposure assessments, developed safe job procedures, implemented hazard controls, and conducted safety and health training for management and hourly employees. From 2011 to 2014, Smith served as the Divisional Manager of Safety and Health for a Department of Defense contractor and was responsible for compliance with federal, state, and corporate regulations and standards of care.

In this case, Smith opined that ArcelorMittal's failure to follow applicable industry safety standards, its own safety policies, industrial safety regulations, and best safety practices used in the steel making industry gave rise to the April 3, 2013 fire. Smith provided 10 numbered opinion paragraphs. Paragraphs 1-3 contain opinions that ArcelorMittal did not meet certain industry standards of safety set in OSHA regulations and that explain the result of the failure to meet the standards. Paragraph 1 states that ArcelorMittal "has an obligation to provide complete and correct information regarding the cabinet gas system prior to the work being performed as required in 1910.147(d)(1)" and that ArcelorMittal failed to do so. Paragraph 2 provides that ArcelorMittal "has an obligation to effectively communicate to Amex Nooter the location and operation of the lock out points up stream of the Cabinet before work was performed on the Cabinet," referencing

1910.147(d)(3), and that ArcelorMittal failed to do so. Paragraph 3 states that ArcelorMittal failed to provide Amex Nooter with an effective Energy Control Procedure (ECP) for the cabinet and that the ECP was not annually reviewed and revised as required by the regulations. In contrast, Paragraphs 4-10 give opinions about ArcelorMittal's failure to follow its own procedures, policies, and handbooks related to safety as well as failure to follow the Operating/Instruction Manual for the excess gas bleeder pilot ignitor system in the west cabinet; these paragraphs do not rely on OSHA or IOSHA standards or legal duties.

In the motion to exclude, ArcelorMittal makes several arguments for the exclusion of portions of Smith's opinion. First, ArcelorMittal argues that Smith's opinions regarding OSHA and IOSHA regulations are inadmissible opinions on the applicable legal duty of care. However, a review of Smith's report and the portions of his deposition testimony cited by ArcelorMittal[1] shows that Smith identified the applicable standards, including those in OSHA regulations, and whether ArcelorMittal met those standards, which, as discussed above, is a proper topic for expert opinion. *See Fanter v. Menard, Inc.*, No. 15 C 7912, 2017 WL 1049835, at *5 (N.D. Ill. Mar. 20, 2017) (finding that industry standards are not conclusive on the legal duty of care but that a jury could

---

[1] On page 5 of its motion, ArcelorMittal identifies four such deposition excerpts, *see* (ECF 148, p. 5), each of which is here quoted as presented in ArcelorMittal's brief:
1. "'ArcelorMittal failed to monitor the work of its outside contractor, Amex Nooter . . . Here, ArcelorMittal left its outside contractor without the effective resources, guidance, or protocol to address safety issues during work activities.' (Exhibit A, p. 2)." This is not a statement of legal duty but rather a standard of care.
2. "ArcelorMittal did not ensure that natural gas was effectively isolated. (Exhibit A, p. 6)." This is not a statement of legal duty but rather a standard of care.
3. "ArcelorMittal had the primary responsibility under OSHA regulations to make sure that Amex Nooter was following its policies and procedures. (Exhibit B, 88:13-22)." This is a misrepresentation of the quoted deposition testimony, which provides:"Q. Do you agree with me that Mr. Olson [an Amex Nooter employee] would have an obligation under OSHA to make sure the cabinets were properly isolated before he allowed his personnel to work on them? A. I would say the primary obligation relies on the host employer to ensure that that procedure, that ECP, is executed properly. And it is up to Amex Nooter to rely on Arcelormittal to ensure that that procedure has been executed."(ECF 148-2, p. 88:13-22).
4. "'Q. You have offered opinions in your report that ArcelorMittal did not meet OSHA standards, correct? A. Correct.' (Exhibit B, 185:12-14)." Again, this is not a statement of whether ArcelorMittal met a legal duty, but rather of whether it met a professional standard.

consider those standards to determine whether the defendant had breached or satisfied its duty of care (citing *Heck v. Simplexgrinnell LP*, No. 14 C 5491, 2016 WL 704811, at \*10 (N.D. Ill. Feb. 23, 2016) ("Plaintiff cites to a litany of cases where courts considered OSHA and analogous state regulations in negligence actions, but he overlooks that not one of the cases relied on the regulations to find that a duty existed. Instead, the cases explain that the factfinder may properly consider such regulations when determining what the duty of care entailed and whether it was breached."))). Nowhere does Smith give an opinion as to a legal duty.

In making this argument, ArcelorMittal misstates the content of Smith's report. Smith opined on whether ArcelorMittal itself met the standards in its actions and maintenance of its facilities and its preparation for the work on April 3, 2013. However, ArcelorMittal states in its brief that "Mr. Smith, in essence, is arguing that under OSHA ArcelorMittal is the only entity that owed a legal duty *to ensure that its experienced contractor, Amex Nooter, performed its work safely*." (ECF 148, p. 2) (emphasis added). Nowhere in his report did Smith give an opinion regarding ArcelorMittal ensuring the safety of the work *performed* by *Amex Nooter*. Smith addressed whether ArcelorMittal ensures a safe working environment in which Amex Nooter could perform its work. The distinction is meaningful.

Likewise, ArcelorMittal reasons that Smith ignored facts that demonstrate that Amex Nooter was responsible for making sure its employees were safe and were performing its work safely, "in essence creating a non-delegable duty owed by ArcelorMittal." (ECF 148, p. 1, p. 6-7).[2] This is a conclusion drawn by ArcelorMittal that is not supported by Smith's report or deposition testimony.

---

[2] Although the parties engage in some discussion of the legal responsibility of a landowner and an employer in relation to the safety of independent contractors, it is unnecessary for the Court to address these legal standards on this motion.

Again, the focus of Smith's report is on the standards that ArcelorMittal was held to, such as in the maintenance of its facility and the preparation for the work on April 3, 2013, and whether ArcelorMittal met the standards. Nowhere did Smith opine that ArcelorMittal had a non-delegable duty. And, most of Smith's opinions go to ArcelorMittal's compliance with its own standards and handbooks. Smith was not retained to opine as to the safety standards governing Amex Nooter, nor do the safety topics he addressed regarding the condition of the excess gas bleeder pilot ignitor system and the valves implicate safety obligations of Amex Nooter.

Second, ArcelorMittal argues that Smith provides a number of opinions directly related to and involving pipefitting despite having no experience in pipefitting. The opinions identified by ArcelorMittal are:

- "ArcelorMittal has an obligation to provide complete and correct information regarding the cabinet gas system prior to the work being performed." (ECF 148-1, p. 5).

- ArcelorMittal was required to mark pressure on gas lines and there were "no markings on the gas lines supplying the West Cabinet indicating their pressure." (ECF 148-1, p. 6).

- ArcelorMittal failed to ensure that all gas valves could be closed and isolated. (ECF 148-1, p. 6).

- "ArcelorMittal failed to make Amex Nooter aware of the hazardous conditions associated with the Cabinet rebuild including but not limited to the incorrect and incomplete ECP for the Cabinet provided to Amex Nooter, the improper position of the gas valves to the igniter system, the unmarked piping leading to and within the Cabinet and the undisclosed and operating salamander heater." (ECF 148-1, p. 7).

ArcelorMittal argues that, because Smith is not a pipefitter and has no pipefitting experience, he is not qualified to give these opinions. The Court disagrees. These opinions are based on Smith's experience as a safety expert and the policies and standards governing ArcelorMittal's conduct in providing a safe work environment; they are not opinions on pipefitting practices.

ArcelorMittal contends that, at his deposition, Smith "outright refused to comment on pipefitting practices when pressed as to the bases for his opinions on Amex Nooter's responsibilities." (ECF 148, p. 2 (citing ECF 148-2, pp. 39:6-14; 42:3-17; 45:22-47:23; 66:6-10; 73:5-20; 92:14-19; 122:6-123:1; 132:21-133:1; 186:12-15)). These deposition excerpts contain questions posed to Smith regarding whether a prudent pipefitter would take various actions. Smith's stated inability to answer those questions because he lacks the necessary expertise does not change his opinion about ArcelorMittal's responsibilities in providing a safe workplace. In fact, it was proper for Smith to decline to opine as to whether certain actions by a pipefitter would be safe when pressed by counsel, given that Smith is not an expert in that field.

Third, ArcelorMittal argues that two of Smith's opinions are not supported by evidence. First, ArcelorMittal notes that Smith opined in his report that ArcelorMittal "had no effective means to isolate the Cabinet to protect the workers by turning off the gas to the Cabinet." (ECF 148-1, p. 6, ¶ 2). ArcelorMittal then notes that during his deposition, Smith admitted that Amex Nooter was able to isolate the cabinet. (ECF 148-2, p. 92:2-12). However, the report and the deposition testimony are not inconsistent when the broader context of each excerpt is read. In the report, the sentence immediately following the quoted sentence above is: "ArcelorMittal failed to effectively respond to and remedy the concerns identified by Amex Nooter." (ECF 148-1, p. 6, ¶ 2). And, the full discussion on this topic in the deposition shows that Smith's opinion was focused on ArcelorMittal's failure to address Amex Nooter's concerns early in the day that ArcelorMittal did not have a way to isolate the cabinet, but that those concerns were no longer an issue once Amex Nooter figured out how to isolate the cabinet on its own. *See* (ECF 148-2, pp. 91:7-97:19). The

report and testimony are about ArcelorMittal's failure to help Amex Nooter and not about whether the cabinet was eventually isolated.

Second, ArcelorMittal notes that Smith opined that ArcelorMittal created a hazard by keeping the valves open outside the cabinet. (ECF 148-1, p. 7, ¶ 7). ArcelorMittal then notes that Smith admitted that this hazard was eliminated when Erik Olson, an Amex Nooter supervisor, closed the valves prior to work beginning at the cabinet. (ECF 148-2, p. 139:1-8). Again, the report and the deposition testimony are not inconsistent. Smith's opinion is that ArcelorMittal created and failed to resolve a hazardous situation. He acknowledges in his deposition that the potentially hazardous result from that situation did not occur because Amex Nooter itself eventually closed the valves.

Finally, ArcelorMittal argues that Smith should not be allowed to opine that "Amex Nooter" was confused about the amount of pressure in the gas piping leading into the cabinets, the valves that needed to be locked out/tagged out, or about the main gas line not being shut down. In support, ArcelorMittal notes that Smith admitted that Amex Nooter supervisor Erik Olson knew the pressure on the line before any work was conducted, never expressed confusion on what valves to isolate and lock out, and understood that shutting off the main gas line was not an option. (ECF 148-2, pp. 38:16-39:5; 49:6-24; 104:24-105:2). This is a matter for cross examination at trial as Erik Olson was not the only "Amex Nooter" employee at the work site. In its brief, ArcelorMittal does not address what knowledge Griffith or Swimline, both Amex Nooter employees working at the site, had of the pressure in the gas piping. Although Smith recognized that Erik Olson knew the pressure in the gas piping, he also testified in the same cited portions of his deposition that Olson was not at the site with Griffith or Swimline at the time of the incident. (ECF 148-2, p. 39:1-2).

Based on the foregoing, the Court denies the Motion to Exclude the Opinion Testimony of Ross Smith.

5.      *Amex Nooter, LLC's [Corrected] Motion to Exclude Testimony of ArcelorMittal's Designated Testifying Expert Donald J. Hoffmann*

In this last motion, the roles are reversed, and Amex Nooter seeks to exclude the testimony of ArcelorMittal's causation expert witness, Donald J. Hoffmann, Ph.D., P.E., C.F.I., arguing that his opinion is unreliable and irrelevant because it is based solely on the deposition testimony of Korrie Griffith.[3]

Dr. Hoffmann is a trained and experienced engineer and scientist in the area of fire and explosion analysis and industrial safety, which Amex Nooter does not dispute. In rendering his opinion, Dr. Hoffmann participated in an inspection of the repaired fire scene on June 21, 2013, took over one hundred photographs of the scene, examined the photographs taken by others shortly after the fire, reviewed the deposition testimony and statements of numerous witnesses, and performed an analysis on fire pattern, fire dynamics, witness observations, and arc mapping.

In his report, Dr. Hoffmann opined, based on the statements and depositions of the witnesses and the post-fire photographs that the fire "originated from the release of natural gas at 120 PSI from the union upstream of the excess gas bleeder flare stack gas valve on the right side of the flare stack cabinet." (ECF 140-19, p. 8). However, he opined that a specific ignition source could not be determined due to the number of potential ignition sources in the area and the amount of variables. *Id*. Dr. Hoffmann opined as to fire cause, concluding that "[t]he cause of the fire without a doubt is

_____

[3] Although Amex Nooter attached Dr. Hoffmann's deposition as a supplement to the motion, at no time has Amex Nooter attached Dr. Hoffmann's report to this motion nor does the instant motion indicate to the Court where Dr, Hoffmann's report can be located on the docket. In the interest of justice, the Court nevertheless considers the motion, having located Dr, Hoffmann's report as filed on the docket separately by Amex Nooter as Exhibit R to Amex Nooter's Motion for Summary at docket entry 140-19.

Mr. Griffith's improper disconnect of the union upstream of the shutoff valve while it was pressurized with gas." *Id*. He opined that, "[s]ince the lockouts/tagouts on the valve are only there to prevent opening the valve and allowing gas to flow into the flare stack cabinet, the conditions and/or application of the lockout/tagout, while important, played no role in the cause of the accident." *Id*. at 10. And, Dr. Hoffmann opined that the implementation of a double block and bleed valve would *not* have prevented the release of natural gas and the fire. *Id*. at 10-11. Further, Dr. Hoffmann provided opinions on industrial safety. He opined that "ArcelorMittal followed the proper procedures, communicated the procedures to Amex Nooter and properly expected Amex Nooter employees to perform their job activities in a safe manner." *Id*. at 12. Dr. Hoffmann opined that, even "[i]f the gas line shut off valve was leaking and was the reason for Mr. Griffith's attempt to repair it," "[a]t no time is it considered appropriate, acceptable, safe, or a proper repair/maintenance practice to disconnect piping that is pressurized with natural gas." *Id*. at 10-11. And, Dr. Hoffmann opined that "[t]he design of the system and requested repairs could have been done safely had the proper precautions and methods been accomplished." *Id*. at 12.

Of all these opinions, Amex Nooter challenges only Dr. Hoffmann's ultimate conclusion on causation:

> The cause of this fire without a doubt is Mr. Griffith's improper disconnection of the union upstream of the shutoff valve while it was pressurized with gas. Mr. Griffith testified that he was attempting to replace the shut off valve while the upstream piping was still pressurized.

*See* (ECF 151, p. 1-2); *see also* (ECF 140-19, p. 8).

An expert's "work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

Amex Nooter argues that Dr. Hoffmann's testimony is unreliable and irrelevant because he did not use any specialized knowledge or reliable methodology or any analysis of data to reach his conclusions as to causation and instead relied only on the deposition testimony of Korrie Griffith. This argument is not supported by Dr. Hoffmann's report or his deposition testimony. Dr. Hoffmann sets out and follows the National Fire Protection Association's guidelines for fire investigation. *See* (ECF 140-19, p. 6-7); *see also* (ECF 160-2, pp. 43:18-44:15). Dr. Hoffmann relied not only on Griffith's testimony but also, as noted above, a site inspection, photographs, and numerous witness depositions and statements. He testified that he relied on reference materials in making his opinion on fire cause and origin in his analysis of the diffusion of natural gas, ignition properties of natural gas, release rate of natural gas, fire dynamics, fire investigation data sources, lockout/tagout, and evaluation of a fire scene. In its motion, Amex Nooter neither acknowledges nor challenges any of these bases or methodologies for his opinion, incorrectly contending that the only information relied upon was Griffith's testimony. To the extent Amex Nooter raises new arguments on this issue in its reply brief for the first time, the arguments are waived.

Amex Nooter also argues that Dr. Hoffmann's opinion on causation should be stricken because he relied on Griffith's testimony that Griffith removed the valve. Amex Nooter argues that Griffith's testimony that he removed the valve is inconsistent with other statements in Griffith's own deposition that suggest Griffith may have taken different action. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on the analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718. Amex Nooter's argument regarding Dr. Hoffmann's reliance on Griffith's testimony is an attack on the factual underpinnings of his analysis and is an appropriate topic for cross-examination and

impeachment. *Id.* at 719. Nowhere in his report or deposition does Dr. Hoffmann offer an opinion on the believability or credibility of Griffith or any other witnesses.

Finally, Amex Nooter argues that Dr. Hoffmann's opinion on causation is irrelevant because the jury does not need Dr. Hoffmann to understand Griffith's testimony. This argument is based on Amex Nooter's narrow characterization of Dr. Hoffmann's opinion as nothing more than repetition of select excerpts of Griffith's testimony. As set forth above, Dr. Hoffmann offers several opinions on multiple issues based on more than Griffith's testimony. And, Dr. Hoffmann opines on the applicable industry standard and whether Griffith met the standard, which, as discussed above, is an acceptable subject of expert opinion. Dr. Hoffmann's testimony will assist the trier of fact in this case to understand the evidence and to determine the facts in issue.

Accordingly, the Court denies the Motion to Exclude Testimony of Donald J. Hoffmann.

## CONCLUSION

Based on the foregoing, the Court hereby (1) **DENIES** Defendant Amex Nooter, LLC's Motion to Strike Hearsay Statements [DE 152]; (2) **GRANTS in part** and **DENIES in part** Plaintiffs' Motion to Exclude Opinion Testimony of Richard Parry [DE 145]; (3) **DENIES** Plaintiffs' Motion to Exclude the Opinion Testimony of Ronald Pape [DE 146]; (4) **GRANTS in part** and **DENIES in part** Plaintiffs' Motion to Exclude the Opinion Testimony of Clifford Bigelow [DE 147]; (5) **DENIES** Plaintiffs' Motion to Exclude the Opinion Testimony of Ross Smith [DE 148]; (6) **DENIES** Amex Nooter, LLC's [Corrected] Motion to Exclude Testimony of ArcelorMittal's Designated Testifying Expert Donald J. Hoffmann [DE 144 and 151].

SO ORDERED this 29th day of December, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT