# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

ARCELORMITTAL INDIANA HARBOR )
LLC and ARCELORMITTAL USA LLC, )
    Plaintiffs, )
     )
v. )      CAUSE NO.: 2:15-CV-195-PRC
     )
AMEX NOOTER, LLC, )
    Defendant. )

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Summary Judgment [DE 142], filed by Plaintiffs ArcelorMittal Indiana Harbor LLC and ArcelorMittal USA LLC (collectively "ArcelorMittal") on September 28, 2017. Defendant Amex Nooter, Inc. ("Amex Nooter") filed a response on October 26, 2017, and ArcelorMittal filed a reply on November 9, 2017.

On April 3, 2013, a fire occurred at Blast Furnace No. 3, a part of ArcelorMittal's Indiana Harbor facility, while Amex Nooter employees Korrie Griffith and Robert Swimline were rebuilding the excess gas bleeder pilot burner cabinets pursuant to a contract between ArcelorMittal and Amex Nooter. As Griffith and Swimline were working, natural gas was released from the system and ignited. ArcelorMittal seeks from Amex Nooter approximately $3.2 million in property damage and excess fuel costs as a result of the fire. ArcelorMittal also seeks reimbursement by Amex Nooter for the cost of ArcelorMittal's defense in litigation brought against it by Robert Swimline. In the instant motion, ArcelorMittal seeks summary judgment in its favor on all three claims in its Second Amended Complaint. For the reasons set forth below, the Court denies ArcelorMittal's Motion for Summary Judgment.

# PROCEDURAL BACKGROUND

On May 15, 2015, Plaintiff ArcelorMittal Indiana Harbor LLC ("ArcelorMittal Indiana Harbor") filed a Complaint against Defendant Amex Nooter, LLC. On December 15, 2015, an Amended Complaint was filed by ArcelorMittal Indiana Harbor. On September 23, 2016, a Second Amended Complaint was filed by ArcelorMittal Indiana Harbor and ArcelorMittal USA LLC ("ArcelorMittal USA") (collectively "ArcelorMittal").

The Second Amended Complaint brings three counts against Amex Nooter. Count I, brought by ArcelorMittal Indiana Harbor only, alleges a claim of negligence based on a breach of Amex Nooter's common law duty to conduct its work in a reasonably safe manner to avoid damage to ArcelorMittal Indiana Harbor's property in relation to the April 3, 2013 fire and resulting damage.

Count II, brought by both ArcelorMittal Indiana Harbor and ArcelorMittal USA, alleges a claim of "Defense" under Sections 22 and 23 of the General Terms and Conditions of the AMUSA-102 Master Agreement, alleging that Amex Nooter has refused and/or failed to defend ArcelorMittal in the lawsuit brought by Robert Swimline against ArcelorMittal.

Count III, brought by ArcelorMittal Indiana Harbor only, alleges a claim of breach of contract for, among other things,[1] (1) refusing to reimburse ArcelorMittal Indiana Harbor for the property damage and other losses incurred by ArcelorMittal Indiana Harbor in the explosion and fire in accordance with the agreement and (2) failing to conduct its work in a reasonably safe manner to avoid damage to ArcelorMittal Indiana Harbor's property. (ECF 116, ¶¶ 90.b., 90.e.).

Amex Nooter filed an Answer on October 14, 2016.

---

[1] The Second Amended Complaint alleges other bases for Amex Nooter's alleged breach of contract, but these two bases are the only ones raised by ArcelorMittal on the instant Motion for Summary Judgment. *See* (ECF 116, ¶ 90).

On December 29, 2017, the Court issued an Opinion and Order ruling on six evidentiary motions filed by the parties, including Amex Nooter's Motion to Strike Hearsay Statements and ArcelorMittal's motions to exclude the opinion testimony of Amex Nooter's expert witnesses Ross Smith and Richard Parry, which are relevant to the instant Motion for Summary Judgment.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure require that a motion for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable jury could find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R.

Civ. P. 56 (a), (c). When the party moving for summary judgment bears the burden of proof at trial, such as ArcelorMittal in this case, the moving party must identify the elements of the claim, cite facts supported by evidence that satisfy the elements, and "demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Baskin v. City of Fort Wayne*, No. 1:16-CV-180, 2017 WL 4799898, at \*5 (N.D. Ind. Oct. 20, 2017) (citing *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992); *Celotex*, 447 U.S. at 331)); *see Celotex*, 447 U.S. at 331 ("If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.") (Brennan, J. dissenting).

"Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(c)(1), (e); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1986)). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248-50.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764, 765 (7th Cir. 2014); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS

### A. The Contract

ArcelorMittal Indiana Harbor is a limited liability company whose sole member is ArcelorMittal USA. (ECF 143-1, ¶ 3). Amex Nooter is in the business of industrial piping and mainly employs pipefitters. (ECF 143-6, pp. 8:8-9:3).

On August 19, 2011, ArcelorMittal USA entered into a "Contractor Work Master Agreement (AMUSA-102) for ArcelorMittal Companies in the USA (June 2011)" (hereinafter "AMUSA-102 Master Agreement") with Amex Nooter. (ECF 143-2, Execution Sheet). Pursuant to the "Execution Sheet" of the AMUSA-102 Master Agreement, Amex Nooter is the "Contractor" and ArcelorMittal USA is the "Owner Signatory." *Id.*

Attached to the AMUSA-102 Master Agreement Execution Sheet is the "AMUSA-102 General Terms and Conditions for Contractor Work for ArcelorMittal Companies in the USA (June 2011)" (hereinafter "AMUSA-102 General Terms and Conditions"). *See* (ECF 143-2).

The AMUSA-102 General Terms and Conditions defines "Owner Companies" as "Owner Signatory and any entity that is organized under the laws of a state in the United States and is

5

directly or indirectly controlled by, or under control of ArcelorMittal SA." (ECF 143-2, General Terms and Conditions § 1(xi)). "Owner" is defined as the "Owner Company issuing Purchase Order applicable to this Contractor Work Contract." *Id*. at § 1(x). "Owner's Indemnitees" is defined as "Owner, all Owner Companies and each of their respective directors, officers, employees, and agents." *Id*. at § 1(xiv).

The AMUSA-102 Master Agreement provides that an "Owner" may issue a Purchase Order to the Contractor, which is Amex Nooter. (ECF 143-2, Execution Sheet ¶ 2). Purchase Orders Nos. N489391 and N489392 ("Purchase Orders") were issued to Amex Nooter by ArcelorMittal Indiana Harbor on March 12, 2013. (ECF 143-3). The Purchase Orders, one for Blast Furnace No. 3 and one for Blast Furnace No. 4, contain the nature and scope of the services Amex Nooter was to provide to ArcelorMittal Indiana Harbor, namely rebuilding the excess gas bleeder pilot burner cabinets at each of the Blast Furnaces at ArcelorMittal Indiana Harbor's West facility in East Chicago, Indiana. *Id*. The "Description" in each of the Purchase Orders provides: "Amex (no sub) to provide supervision, labor, and materials to rebuild [H3/H4] excess gas bleeder pilot burner cabinets. Cabinets to be rebuilt per the drawings submitted to Amex. The demo and installation of the new piping and valving to be done on the 3rd of April. Job to be t&m." *Id*. at pp. 2, 4.

The AMUSA-102 Master Agreement provides that Amex Nooter may accept a Purchase Order "either by express acceptance thereof or by beginning performance of the Contractor Work specified therein." (ECF 143-2, Execution Sheet ¶ 3). The same paragraph also provides:

> Each Contractor acceptance of a Purchase Order shall create a separate binding and enforceable contract (a "Contractor Work Contract") with respect thereto, with each Contractor Work Contract consisting of the Safety Handbook, the AMUSA-102 General Terms and Conditions, the Purchase Order (including without limitation the Contractor Work, Contract Price and Contract Schedule (or equivalent terminology)

as defined and specified in the Purchase Order) and any Other Contractual
Documents.

*Id*. Amex Nooter's acceptance of the Purchase Orders was an acknowledgment by Amex Nooter that

it read, understood, and accepted all terms, conditions, and provisions in each of those documents

that make up the Contractor Work Contract. *Id.*

Regarding any inconsistencies or discrepancies that arise, the AMUSA-102 Master

Agreement provides:

> In the event any inconsistencies or discrepancies arise among any parts of the
> Contractor Work Contract and the precedence is not otherwise specified, (I) the
> Safety Handbook shall take precedence over the AMUSA-102 General Terms and
> Conditions, (II) the AMUSA-102 General Terms and Conditions shall take
> precedence over the Purchase Order; and (III) the Purchase Order shall take
> precedence over the Other Contractual Documents.

*Id*. at ¶ 5.

The AMUSA-102 General Terms and Conditions provides:

> This Contractor Work Contract represents the entire agreement of the Parties with
> respect to the subject matter hereof; and no agreement or understanding in any way
> modifying this Contractor Work Contract (including change orders) shall be binding
> upon Owner or Contractor unless made in a writing that both (i) states that it amends
> this Contractor Work Contract; and (ii) is signed by authorized representative of each
> of Owner and Contractor. . . . Any reference to Owner's or Contractor's general
> terms and conditions of purchase, sale or performance in any Purchase Order or any
> communication or document issued or delivered by Contractor (including, [but] not
> limited to acknowledgments or invoices) shall not be operative, binding or effective.

(ECF 143-2, General Terms and Conditions § 2(a)).

Both Purchase Orders include this statement: "AMUSA-100 Terms and Conditions will

apply to this Purchase Order." (ECF 143-3, pp. 2, 4).

Under the AMUSA-102 General Terms and Conditions, Amex Nooter owed certain obligations to the Owner, ArcelorMittal Indiana Harbor, including the following provisions identified by ArcelorMittal in the Motion for Summary Judgment:

- Amex Nooter has read and understands ArcelorMittal Indiana Harbor's "Code of Business Conduct" and Amex Nooter "shall not take any action inconsistent with or contrary to Owner's Code of Business Conduct in the performance of this Contractor Work Contract." A violation of the Code of Business Conduct may constitute a material breach of the Contractor Work Contract. (ECF 143-2, General Terms and Conditions, "Compliance with Laws, Rules and Policies", § 4(e)).

- Amex Nooter was required to comply with the "safety, health and environmental rules specified by Applicable Laws or the Safety Handbook or other rules of Owner especially applicable at the Job Site" during the performance of the Contractor Work Contract. (ECF 143-2, General Terms and Conditions, "Sustainable Development; Safety", § 3(a)).

- "Disregard for . . . the Safety Handbook or any other applicable safety rules shall be deemed to be a material breach of this Contractor Work Contract." *Id*. at § 3(b).

- Amex Nooter was obligated to "control access to the Job Site and be responsible for all persons and Work at the Job Site." *Id*. at § 3(c).

Section 22 of the AMUSA-102 General Terms and Conditions, titled "Indemnification, Damages, and Liabilities," provides:

Contractor shall . . . indemnify, defend and save harmless the Owner's Indemnitees from and against any and all Claims made by any person or persons by reason of any act or omission on the part of Contractor or any of its Subcontractors or any employee, agent or invitee of Contractor or any of its Subcontractors, including any breach or alleged breach of any statutory duty that is to be performed by Contractor under this Contractor Work Contract but is, or may be the duty of, any of the Owner Indemnitees under Applicable Laws. Notwithstanding the foregoing obligations in this Section 22(a), Contractor shall not be required to indemnify and save harmless Owner's Indemnitees from Claims that are finally determined by a court with jurisdiction to have been caused solely by the negligence or willful misconduct of Owner's Indemnitees; provided, however, that the condition or operation of Owner's Indemnitees' production and manufacturing facilities in the normal course of Owner's Indemnitees' businesses shall be deemed not to be negligence or willful misconduct.

(ECF 143-2, General Terms and Conditions § 22(a)).

The following paragraph of the AMUSA-102 General Terms and Conditions provides:

> In the event of any Claim covered under Section 22(a) above, immediately upon Owner's demand Contractor shall assume at its expense, on behalf of Owner's Indemnitees, the defense of any action at law or in equity that may be brought against Owner's Indemnitees . . . . In the event Contractor fails or refuses to indemnify, defend and save harmless as specified in this Contractor Work Contract, then, in addition to any other damages allowable by law, Contractor shall be liable to Owner for the costs (including without limitation reasonable attorney's fees) of enforcing Contractor's agreement to indemnify, defend and save harmless.

*Id*. at § 22(b). "Claims" is defined as:

> Any and all claims, actions, suits, demands, arbitrations, and causes of actions or other similar activity made, filed, done or attempted or submitted for or on account of any actual or alleged liabilities, losses, damages, fines, penalties, awards, judgments, decrees, orders, holdings, determinations, opinions, costs and expenses of every kind and amount whatsoever (including without limitation reasonable attorney's fees), on account of or as a result of any actual or alleged loss of, damage to or defect in property or any actual or alleged disease, illness or injury, including death, of one or more persons.

*Id*. at § 1(iii).

## B. Amex Nooter's Scope of Work on April 3, 2013

Frank Peters, the Senior Maintenance Planner for ArcelorMittal Indiana Harbor, was responsible for planning major outages, writing contractor scopes of work, bidding out projects, and handling daily maintenance planning for Blast Furnaces Nos. 3 and 4. (ECF 143-4, pp. 10:19-11:4). In early March 2013, he wrote the scope of work for Amex Nooter to rebuild the excess gas bleeder pilot burner cabinets at Blast Furnaces Nos. 3 and 4. *Id*. at pp. 12:13-13:2. Prior to writing this scope of work, Frank Peters spoke with Ray Smith, Amex Nooter's Superintendent, and explained the nature and scope of the work Amex Nooter was to perform, which was "to replace the existing

piping, put new valves in, new gauges, and it was pretty clear-cut what had to be done." *Id*. at pp. 14:14-15:11.

### C. The April 3, 2013 Fire

Korrie Griffith was an employee of Amex Nooter from approximately March 2012 to September 2013 as a welder pipefitter. (ECF 143-7, pp. 9:23-10:24, 11:12-16). Erik Olson, an Amex Nooter foreman, was present at Blast Furnace No. 3 on the date of the fire and was the supervisor of Korrie Griffith and Robert Swimline. (ECF 143-5, pp. 23:16-21, 30:8-33:4). Prior to Griffith and Swimline beginning work at the cabinets, Olson gave them instructions on the work they were to perform: replacing the bottom half of the piping inside the excess gas bleeder pilot burner cabinet at Blast Furnace No. 3. *Id*. at pp. 30:8-33:11.

James Stalley, Amex Nooter's Safety Director, testified that Amex Nooter's supervisors and foremen were responsible for ensuring Amex Nooter's employees performed their work in a safe manner and that no unsafe conditions existed at their worksite. (ECF 143-6, pp. 98:21-99:8). As an Amex Nooter supervisor, Erik Olson was also required to continually monitor the safety performance of all Amex Nooter employees under his charge, including Robert Swimline and Korrie Griffith. *Id*. at p. 99:13-22. Amex Nooter employees, including Swimline and Griffith, were responsible for reporting hazardous conditions on the worksite to Amex Nooter supervisors. *Id*. at pp.101:16-102:6.

Erik Olson met with Frank Peters prior to Amex Nooter performing any work on the cabinets to discuss Amex Nooter's work for that day. (ECF 143-5, pp. 55:20-56:20). Olson testified that it was the responsibility of Amex Nooter and ArcelorMittal Indiana Harbor to identify and rectify hazards. *Id*. at 57:15-23. Olson agreed that it was Amex Nooter that performed an initial survey of

the work site to identify any hazardous conditions. *Id*. at pp. 57:24-58:5. Olson walked the gas line

with Frank Peters and received instructions on what valves needed to be closed, locked out, and

isolated. *Id*. at pp. 65:23-66:19; 76:21-78:5.[2] Olson communicated all of this information to Korrie

Griffith and Robert Swimline later that day. *Id*. at pp. 65:22-66:8; 76:21-78:5. Before Griffith and

Swimline arrived at the cabinet on April 3, 2013, the top part of the cabinet was already completed.

*Id*. at p. 30:3-17.

Olson testified he specifically told Swimline and Griffith to "leave this valve alone,"

referring to the gas valve that came off in the incident. *Id*. at pp. 31:4-32:1. Griffith testified that

Olson told him to "try not to mess with the valve" and told him that ArcelorMittal Indiana Harbor

had told Olson that ArcelorMittal had not shut off the gas:

> Q.     So you and Robert were going to replace the piping and valves inside of the cabinet?
> A.     Right, which was already started.
> Q.     Korrie, did you place your lock on – Strike that.
>        Before you started to work on the cabinet, did you place your lock on anything?
> A.     Not that lock box, but it was on for a different job.
> Q.     Did you see any locks on any of the –
> A.     They had lock boxes there.
> Q.     Did you see any locks on any of the piping going into the cabinet?
> A.     No.
> Q.     Was it represented to you that the line going into the cabinet that you and Robert were going to work on had locks placed on it?
> A.     They said it was locked out.
> Q.     Who is "they," .. . .
> A.     Our supervision, Olson, he said that – you know, there is a lock box but, you know –
> Q.     There is a lock –
> A.     Once they are going to lock out, there is nothing to lock out, and they didn't lock it out.

---

[2] In connection with these facts in its Statement of Undisputed Material Facts, ArcelorMittal represents that Olson testified that he "raised no issue as to safety" when walking the line with Frank Peters. However, the cited portions of the deposition do not support this statement. (ECF 143, p. 6).

> Q. What exactly did Olson tell you?
> A. Go up there and finish the job, that's basically it.
> Q. Did he even mention anything about –
> A. He said don't – try not to mess with the valve, and they knew it was live, and he said they denied shutting it off. So they knew what the situation was.

(ECF 143-7, p. 131:8-14). Olson testified that Swimline and Griffith did not have any questions about Olson's instructions on how to perform the job or on not touching the gas valve attached to the live gas line leading into the cabinet. (ECF 143-5, pp. 29:11-34:2). Eric Frahm, an Amex Nooter foreman, testified that he checked the bleeder to be sure that there was no gas past the valve. (ECF 143-9, p. 73:17-24). When asked if he had done a visual inspection of the valve that Griffith removed, Frahm testified, "You would hear a hundred pounds screaming. If there was a leak it will be screaming like nobody's business." (ECF 143-9, p. 74:1-17).

*1.      Korrie Griffith Removed a Live Gas Valve*

Korrie Griffith testified that he and Robert Swimline were the only two individuals who witnessed the explosion on April 3, 2013. (ECF 143-7, p. 20:12-16). He then gave the following deposition testimony regarding the gas valve.

> Q. And then one of the other things you told me was that -- now, let me stop there.
> I know the valve came off.
> A. Right.
> Q. Before we get to how it came off, I just want to make sure I understand what you told me when we were on the phone: You mentioned that you knew that that valve was leaking gas, right?
> A. Yes.
> MR. RITCHIE: Objection, vague.
> BY MR. RELIFORD:
> Q. And you knew that valve was leaking gas at the time that you guys attempted to do your work, correct?
> MR. RITCHIE: Objection, leading.
> THE WITNESS: Yes.
> BY MR. RELIFORD:

Q.      The other thing I'm just trying to rack my brain with here, I believe you said that when the valve came off, you spent about a minute or two trying to get that valve back on?

A.      I tried --

MR. RITCHIE: Objection, form and foundation, go ahead.

THE WITNESS: I did try to get it on, but it wasn't even that long.

BY MR. RELIFORD:

Q.      Do you remember how long it was, because I can't remember what you told me on the phone?

A.      Honestly, everything happened so fast.

Q.      Okay.

A.      And the next thing I knew it was a big bright yellow flash, and I took and run. And Robert Swimline was looking for me, and I didn't -- he said he looked for me, and I was already gone, so I don't know.

MR. RELIFORD: Okay.

BY MR. RELIFORD:

Q.      So you remember -- and I know there was a big ball of fire, right?

A.      Right.

Q.      But you remember trying to put the valve back on?

A.      Yes.

MR. RITCHIE: Objection, form and foundation.

MR. RELIFORD: I'm sorry, I didn't get your answer.

THE WITNESS: Yes.

BY MR. RELIFORD:

Q.      And you spent, what, about a minute trying to get that valve back on?

A.      Yes.

*Id.* at pp. 43:23-45:23.

Q.      Were you able to get it back on?

A.      No.

Q.      And when you were trying to get the valve back on, okay, and I know we didn't talk about this during our phone call, but when you were trying to get that valve back on, were you using your hands or were you using some sort of pipe wrench or some other pieces of equipment?

A.      My hand.

MR. RITCHIE: Objection, form and foundation.

THE WITNESS: Honestly, I just remember trying to get the screw back on.

BY MR. RELIFORD:

Q.      With your hands?

A.      Yeah.

Q.      Do you recall using any sort of equipment?

A.      To try to get it back on?

Q.      Yes, sir.

A.      No, I am a human being, my left hand.

*Id*. at p. 46:4-21.

Q.      . . . Now, when you started working on the cabinet, the subject valve that
came off, was that loose?
MR. RITCHIE: Objection, form and foundation, go ahead.
MR. RELIFORD: You can answer.
THE WITNESS: It wasn't on very tight.
BY MR. RELIFORD:
Q.      And you saw that with your own eyes?
A.      Yes.
Q.      So when you saw that that valve was not on very tight, you could also smell
gas leaking, correct?
MR. RITCHIE: Objection to form and foundation, it's compound, go ahead.
THE WITNESS: Yes.
BY MR. RELIFORD:
Q.      And this is before you started doing any work, correct?
A.      Yes.

*Id*. at p. 47:7-20; *see also id*. at p. 61:5-12 (smelling gas).

A.      Yes, and the steel mill also refused to turn that gas off and still let us go work
on it.
. . .
A.      Without double block and bleeders, nothing to protect us to work on that
stuff.

*Id*. at p. 48:3-4, 8-9; *see also id*. at pp. 86:24-87:20 (double block and bleed).

Q.      And did you then try to fix the valve so it would stop leaking?
A.      I did.
Q.      Tell me what you did?
A.      I was trying to tighten things up and then it came off.
Q.      So in the process of you trying to tighten that value off, the valve came off?
A.      Yeah, because I was starting to mess with it, and that's why I said it wasn't
on very tight, and it came off when I tried messing with it.

*Id*. at p. 50:7-17.

Q.      And then you tried to tighten the valve, correct?
A.      Yes.
Q.      And in the process – In the process of you trying to tighten the valve, the
valve came off?

| | |
|---|---|
| A. | Right, because it was barely on. |
| Q. | And that's when the gas started leaking out, correct, yes? |
| A. | Coming out at 100 some pounds of pressure of live gas, yes. |
| Q. | And that's when you then tried to put the valve back on, correct? |
| A. | Correct. |

*Id*. at pp. 51:12-52:1.

| | |
|---|---|
| A. | They told us the steel mill wouldn't shut it down. |
| Q. | Who is "they"? |
| A. | Erik Olson, Ray Smith, they put in a request to shut it down, the steel mill refused. |
| . . . | |
| A. | And they refused to shut the gas off so they still told us to go up there and finish it, the mill. |

*Id*. at p. 56:8-16.

| | |
|---|---|
| Q. | . . . I understand that your work assignment that you got directly from Erik Olson was work associated with the subject valve; is that correct? |
| A. | Most of the subject was go up there and finish piping that gas cabinet. |
| Q. | Right, but I mean a portion of the work involved was associated with the valve; is that correct? |
| A. | Because we had to connect to that valve. |
| Q. | And you got to tighten it, correct? |
| A. | We had to do all of that stuff. |

*Id*. at p. 60:14-23.

| | |
|---|---|
| Q. | Here is my question, because I know that you in the process of attempting to tighten the valve, um, the valve came off, but here is my question: Were you told to change the particular valve because it wasn't holding pressure by Erik Olson? |
| A. | He said if we can fix it, try to fix it. |
| Q. | And did you understand that to mean? |
| A. | Try to change it. |
| Q. | Try to change it? |
| A. | On the run. |
| Q. | "Change it on the run," tell me that what means? |
| A. | On the fly. |
| Q. | While gas is still running up to it? |
| A. | Yeah. |
| Q. | That's what you understood Erik Olson's instructions to be? |
| A. | Yes. |

Q.      So you get your instructions from Erik Olson, and following those instructions from Erik Olson you attempted to change the valve while the line was still live --

A.      Yes.

Q.       -- following Erik Olson's directive; is that correct?

MR. RITCHIE: Objection to form and foundation.

THE WITNESS: Correct.

Q.      Had you ever done that before as a pipefitter?

A.      Yes.

Q.      You understand that that's not a safe practice?

A.      Yes.

Q.      And you understood that was not a safe practice at the time?

A.      Yes.

*Id.* at pp. 65:7-66:16.

Q.      Now since the incident, and any work you've done as a pipefitter, okay, have you ever changed out a valve or attempted to change out a valve where gas is still running down to the point of the valve?

A.      Not since, no.

Q.      Is that because you – it's dangerous?

A.      Yes.

*Id.* at p. 99:11-17.

Q.      So my question to you is: Did you believe that you had done anything wrong with respect to the work that you were performing?

A.      I didn't think I did anything wrong until that happened.

Q.      Until what?

A.      Until the explosion.

*Id.* at pp. 73:19-74:1.

Q.      Did you feel you caused the explosion?

A.      Well, I didn't feel I caused it, all I–you know, I just know I was doing my thing.

*Id.* at p. 74:4-6.

Q.      . . . You mentioned something about the 125 PSI of the force of the gas that was coming out of that pipe?

A.      Yeah.

Q.      Did you know that that was that much pressure before this incident?

A.      No.

16

Q.      When did you learn that?

A.      Obviously afterwards.

Q.      Do you recall when?

A.      After they told me I was laid up in the hospital.

. . .

Q.      You knew, though, that when you were–when you were in the process of changing out the valve, you knew that gas would escape into the environment, you just didn't know how fast it was going to come out; is that fair?

. . .

THE WITNESS: That sounds fair enough, yes.

*Id*. at pp. 96:20-97:19.

Q.      You were changing out the valve, correct?

A.      Yeah.

Q.      Now did you have another valve to replace the valve that you were attempting to remove?

A.      Yes.

Q.      Was the valve next to you, the new valve that you were going to put on?

A.      Yes.

Q.      So was it the case that you unscrewed the subject valve, put that one down, and then put the – tried to put the new one on or tell me what happened there?

MR. RITCHIE: Objection to form and foundation, it's compound, go ahead.

A.      It wasn't like slow and steady.

Q.      I know, because I'm not there, that's why I asked the question.

A.      It's called hurry up and try to do it and get it done with.

Q.      And the reason that you were going to try to hurry up and do it is because you knew that there was gas blowing through that line, correct?

A.      Yes.

Q.      So hurrying up – The effect of trying to hurt up was to be able to, what, to minimize –

A.      Gas.

Q.      Any gas, okay. So as soon as you took the subject valve off, gas starting blowing through pretty strong, correct?

MR. RITCHIE: Objection to form and foundation, mischaracterizes the testimony of the witness, go ahead.

Q.      Yes?

A.      Yes.

Q.      And then – Here is my last question. Did you then try to put back on the same valve you had just taken off or did you reach for the new valve and tried to put the new valve –

A.      I already had the new one in hand.

Q.     Okay.

A.     I already had the pipe doped and ready to go, so I would just fucking change it.

Q.     So you were ready to put that new valve on?

A.     I was ready to rock and roll, buddy. And I guess instead of trying to be a hero, I turned out to be a zero. . . .

*Id*. at pp. 102:17-104:18. Korrie testified that he had previously changed out live valves for other employers. *Id*. at pp. 104:19-105:13.

    Amex Nooter's counsel then asked:

Q.     Just so I understand, Korrie, is it your testimony that the valve came off while you were attempting, first, to secure it to prevent the leaking gas or do you – what were you trying to do at the time of the accident?

MR. RELIFORD: Objection, asked and answered, he already said he was trying to --

MR. RITCHIE: I haven't asked it.

MR. RELIFORD: -- take it off.

MR. RITCHIE: I haven't asked it.

MR. RELIFORD: I asked it.

MR. RITCHIE: It doesn't make any difference, Art.

MR. RELIFORD: He already said he was trying to take it off.

THE WITNESS: I answered it.

MR. RITCHIE: The objection is -- was when I've asked it before, not if someone else. I'm entitled to conduct a cross-examination.

MR. RELIFORD: I'm entitled to an objection, asked and answered.

A.     The honest truth is, yes –. . . we were trying to – we were trying to fix it, and I -- you know, in an attempt to try to fix it, Erik said, go ahead, if you can fix it, try to fix it. So we unscrewed it, and put it back on. But it also wasn't just "go ahead," I asked my supervisor first.

*Id*. at pp. 105:24-107:2.

Q.     Do you know if your request for the installation of a double block and bleed had been communicated to the mill?

A.     Yes.

Q.     It had been communicated to the --

A.     It had been brought up before, they said they would do it at a later date and time.

Q.     Okay, so the mill decided --

A.     That's what I was told.

Q.     Yeah, who told you that?

MR. RELIFORD: Objection, hearsay.

THE WITNESS: Erik Olson, and Ray Smith, and all of them.

MR. RITCHIE: Okay.

THE WITNESS: Supervision.

BY MR. RITCHIE:

Q.  So it was your understanding that your request for a double block and bleed before you worked on the cabinet that's involved in the accident had been communicated to ArcelorMittal, and that ArcelorMittal said: "Don't do it, we will do it later"?

A.  Correct, that's -- I don't know if Arcelor -- but that's what I was told that they would do it on the next shutdown.

*Id*. at pp. 109:21-110:15.

As soon as Griffith removed the valve, gas quickly started blowing through the valve "pretty strong" and ignited into a "big ball of fire." *Id*. at pp. 45:11-13,103:23-104:5.

Griffith testified that, on the day of the incident, he did not have any interaction with anyone from ArcelorMittal Indiana Harbor and that no one from ArcelorMittal Indiana Harbor told him where to go, what to do, or how to do it. *Id*. at pp. 136:4-10. He also testified that ArcelorMittal Indiana Harbor did not give him any specific training on how to do pipefitter work and never trained him to change out a valve while gas was still running to the point of the valve. *Id*. at p. 155:8-22.

When shown a photograph of the salamander heater that was present at the worksite but hidden behind a wall, Griffith testified that he did not recognize the salamander heater. *Id*. at p. 112:5-24. He testified that he did not know that there was a heater behind the corrugated steel wall at the cabinet work site or that the heater was on. *Id*. at p. 114:3-12. When shown a picture of a valve

and pipe marked as Bates Arcelor 00318, Griffith testified that he did not think that the valve in the picture was the valve involved in the incident. *Id*. at pp. 121:20-122:23.

2.      *Testimony That Korrie Griffith's Actions Were Dangerous*

Robert Swimline and Eric Frahm testified that changing a gas valve out under pressure was a dangerous action.

Robert Swimline testified:

Q.      So Korrie told us that he removed that valve that the gas was still live to intentionally. Did you know that?
A.      No.
MR. RITCHIE: Objection to form and foundation.
Q.      So if he did that, per his testimony, that would be, in your words, committing suicide, true?
MR. RITCHIE: Objection to form, foundation.
A.      True.
Q.      That's a very dangerous thing to do, correct?
A.      True.
Q.      And you know that something like that, changing out a valve under pressure is extremely dangerous, correct?
A.      Correct.
Q.      Not only does he put himself in danger, but he puts you in danger by doing an act like that, correct?
A.      True.

(ECF 143-8, pp. 76:10-77:4).

Eric Frahm testified:

Q.      And unscrewing a valve that was attached to a line that was still live with gas was an extremely unsafe thing to do?
A.      Yes. I can't understand – I've changed valves out on the fly before live. Water valves.
Q.      Water valves.
A.      Water valves. Maybe an air valve. You do not change something that is flammable out, especially natural gas. You would never do that. No fitter with any common sense, any ability at all or any knowledge would ever do that.

(ECF 143-9, pp. 32:22-33:8).

3. *Korrie Griffith's Post-Incident Admissions*

Amex Nooter's Safety Director Jim Stalley testified that he interviewed Korrie Griffith after the incident:

> Q. But you understood that – at least based on what Korrie told you that between – that Korrie experienced a flash with the valve that he came into contact with; is that correct? And I'm directing your attention to the bottom of page 1242 where it says initial contact with valve until flash --
>
> A. Yes. Yes. Correct, right.
>
> Q. -- was about a minute, correct?
>
> A. Yes
>
> Q. So was it your understanding based on what Korrie told you that the valve he removed resulted in a flash of some sort, correct?
>
> A. From what he told me, yes.
>
> . . .
>
> Q. But you did talk to Korrie Griffith later that month about a valve that he removed that caused a flash when he removed it, correct?
>
> MR. RITCHIE: Object to the form of the question, mischaracterizes the testimony of the witness. Go ahead.
>
> A. That's what Korrie told me.
>
> Q. And Korrie didn't tell you when he talked about the valve that he removed that he had witnessed a flash before he removed the valve; is that correct?
>
> A. Could you say that again, please?
>
> Q. Korrie never said that he experienced a flash with respect to the valve before he removed the valve, correct?
>
> MR. RITCHIE: Object to –
>
> Q. He never said that, correct?
>
> MR. RITCHIE: Object to form, foundation. Go ahead.
>
> A. Not that I – no, not that I recall.
>
> . . .
>
> Q. But you did have a conversation with one of the two witnesses who were involved in the occurrence, correct?
>
> A. Yes.
>
> Q. And you had that conversation with Mr. Griffith, who is one of the two witnesses in late April 2013, correct?
>
> A. Yes.
>
> Q. And he talked about a valve that he took off, and when he took off a valve, there was a spark, correct – it was a flash, I'm sorry, correct?
>
> A. That's what he says, yes.

(ECF 143-6, pp. 175:17-176:6; 193:4-194:3; 212:14-213:2).

Following the explosion, Amex Nooter foreman Eric Frahm testified that he heard Korrie

Griffith state the following:

> Q.    Did you hear Korrie Griffith say anything when you [saw] him?
> A.    Oh, yeah.
> Q.    What did he say?
> A.    Well, first when he comes down, I get back down stopping it, Ray's got him
>       because he's trying to take off. He goes I can't pass the piss test, I can't pass
>       the piss test, this is my fault. I did this, I did this. I just killed a guy. I just
>       killed a guy.
> Q.    You heard --
> A.    Korrie say this, yeah.
> Q.    -- Korrie say I can't pass the piss test?
> A.    Yeah, I heard him. The two ambulance drivers heard him and Ray heard him.
> . . .
> Q.    So do you have any evidence as we sit here today, I'm just asking, do you
>       have any direct knowledge that Korrie actually changed the valve out on the
>       fly or is that –
> A.    Besides him telling me he did it?
> Q.    So he told you that?
> A.    Yeah.
> Q.    What did he say exactly?
> A.    He said I fucked up. I thought I could do it on the fly.
> Q.    That's what he told you?
> A.    Yeah.
> Q.    And that's what you observed – that's what you heard immediately after the
>       accident?
> A.    Yeah, because he's freaking out and he can't pass the drug test. He goes, I
>       killed a guy. Oh, my God, I killed a guy. He goes, I tried to do it on the fly.
>       I fucked up, I fucked up, I fucked up.

(ECF 143-9, pp. 18:3-17, 42:16-43:10).

## D. Amex Nooter's Expert Witness Opinions

Amex Nooter offers two expert witness opinions in response to the Motion for Summary Judgment.

*1.     Ross V. Smith*

Health and industrial safety professional Ross V. Smith opines on the customs and practices of the steel industry and ArcelorMittal's failure to provide "complete and correct information regarding the cabinet gas system prior to work being performed." (ECF 159-2, p. 6, ¶ 1). Smith notes, for example, that information regarding the amount of pressure of the line on which Griffith was working on April 3, 2013 was not marked. *Id*. Smith opines on several of ArcelorMittal's other failures to provide a safe work environment:

- ArcelorMittal failed to have a written procedure to isolate the energy to the West Cabinet once it was discovered the gas valves at the Cabinet could not be closed, and the gas valves that were attempted to be used as isolation points were inoperable, *id*. at p. 7, ¶ 2;

- ArcelorMittal did not provide Amex Nooter with an effective Energy Control Procedure for the Cabinet, *id*. at p. 7, ¶ 3;

- ArcelorMittal failed to demonstrate the "Shared Vigilance" required to allocate the necessary occupational safety and health resources to allow the parties the ability to evaluate the inoperable valve issues and proceed with the work, *id*. at p. 7, ¶ 4;

- ArcelorMittal failed to monitor the work of Amex Nooter, contrary to ArcelorMittal's own handbook on Contractor Safety, Health and Environment, *id*. at p. 7, ¶ 5;

- Through the failure of monitoring Amex Nooter's work on the Cabinet, ArcelorMittal failed to allocate effective safety and health support to Amex Nooter during the scheduled maintenance, *id*. at p. 7-8, ¶ 6;

- ArcelorMittal created a hazardous situation for Amex Nooter by failing to operate the Excess Gas Bleeder Pilot Ignitor System in the West Cabinet in accordance with its own Operating/Instruction Manual, *id*. at p. 8, ¶ 7;

- ArcelorMittal failed to make Amex Nooter aware of the hazardous conditions associated with the rebuild of the Cabinet, *id*. at p. 8, ¶ 8; and

- ArcelorMittal, as the host employer, had a specific Energy Control Procedure to lock out the involved excess gas bleeder cabinet which, therefore, took precedence over any lock out/tag out program of Amex Nooter, *id*. at p. 8, ¶ 9.

*2.     Richard W. Parry*

Mechanical engineer and process management expert Richard W. Parry opines on the root cause of the April 3, 2013 fire and places the blame on ArcelorMittal's conduct, acts, and omissions. (ECF 159-1). Parry concludes that the "root cause of the accident was the failure of ArcelorMittal to install and maintain a safe/functional gas supply system." (ECF 159-1, p. 5, ¶ 1). Specifically, Parry opines:

- "The norm when tapping a main gas branch header to supply a feed line to equipment such as the excess gas bleeder pilot burner cabinets is to install a shutoff valve at the point of the tap. There was no header shutoff valve in the feed line to the H3/H4 ignitor cabinet." *Id*. at pp. 5-6, ¶ 1.A.

- "ArcelorMittal failed to maintain . . . the mechanical integrity of its high pressure natural gas supply system in that, on April 3, 2016 [sic] several of the system's critical shutoff valves could not be closed and/or when closed did not effectively block the flow of the high pressure gas. Even though ArcelorMittal has an ongoing preventative maintenance program and a "reliability maintenance group," these shutoff valves were not included/scheduled for inspection or for functional testing." *Id*. at p. 6, ¶ 1.B.

- "ArcelorMittal failed to check or test these shutoff valves prior to the April 2013 scheduled outage." *Id*. at p. 6, ¶ 1.C.

- "When dealing with high pressure gas, the 'accepted good engineering practice' is to use a 'double block and bleed' isolation methodology. Because of the conditions discussed above, Amex Nooter had to rely on a single shutoff valve which proved unreliable." *Id*. at p. 6, ¶ 1.D.

Parry opines that, in the pre-planning phase, the salamander heater "was missed by ArcelorMittal. It should have been shut-off and moved to storage a month before the scheduled

outage." *Id*. at p. 7, ¶ 2. Parry opines that the failure to label and convey the magnitude of the high pressure gas line within the cabinets was a contributing factor to the incident and that it was ArcelorMittal's responsibility to "convey the magnitude of the energy source to the tradesman." *Id*. at p. 8, ¶ 3. Finally, Parry opines that the defective shutoff valves delayed fire suppression. *Id*. at p. 8, ¶ 4.

### E. Demand and Defense Letters and the Robert Swimline Litigation

On December 10, 2013, ArcelorMittal USA tendered its defense generally to Amex Nooter for the April 3, 2013 fire: "Pursuant to the contract, specifically Sections 22 (Indemnification, Damages and Liabilities) and 23 (Risk of Loss; Insurance), ArcelorMittal tenders the defense and indemnity of this matter to Amex Nooter." (ECF 143-14, p. 2). The letter references the contract between Amex Nooter and ArcelorMittal USA. There is no reference in this letter to litigation by Robert Swimline or any other litigation brought against ArcelorMittal. There is no reference in the letter to ArcelorMittal Indiana Harbor.

On January 9, 2014, ArcelorMittal USA issued a demand letter to Amex Nooter seeking full reimbursement of the expenses it incurred as a result of the damage to the Indiana Harbor facility from the April 3, 2013 fire. (ECF 143-13). The letter references Section 22 of the AMUSA-102 Master Agreement. *Id*. at p. 3. There is no reference in this letter to litigation by Robert Swimline or any other litigation brought against ArcelorMittal. There is no reference in the letter to ArcelorMittal Indiana Harbor.

On August 1, 2014, Robert Swimline filed a complaint against ArcelorMittal Indiana Harbor, only, in the Lake County, Indiana, Circuit Court, for his injuries arising out of the April 3, 2013 fire. (ECF 159-11).[3]

On August 28, 2014, "ArcelorMittal" "renewed" its December 10, 2013 tender of defense. (ECF 143-16, p. 2) (claims administrator acceptance of defense referencing the August 28, 2014 renewed tender of defense). ArcelorMittal has not provided a copy of the August 28, 2014 renewed tender of defense.

The Court takes judicial notice that ArcelorMittal Indiana Harbor removed Swimline's complaint to this Court on September 19, 2014, that on April 2, 2015, the Court granted Swimline leave to file an Amended Complaint to add as defendants ArcelorMittal USA, Frank Peters, and Amex Nooter, and that, on April 2, 2015, this Court remanded the case to state court based on the joinder of Frank Peters, whose addition as a party defendant destroyed complete diversity of citizenship juridiction. *See* Cause No. 2:14-CV-343-RL-PRC.

On April 20, 2015, Amex Nooter and its insurer accepted ArcelorMittal USA's tender of defense with respect to the claim by Robert Swimline arising out of the April 3, 2013 loss. (ECF 143-16).

On January 22, 2016, counsel for ArcelorMittal wrote a two-sentence email letter: "We still haven't received payment for defense costs incurred from date of tender to acceptance. Can you please check on the status of payment and advise as to when we can expect payment." (ECF 143-17).

---

[3] Although ArcelorMittal did not attach a copy of the August 1, 2014 state court complaint as an exhibit to this motion, Amex Nooter attached a copy as an exhibit to its response. *See* (ECF 159-11).

## ANALYSIS

Plaintiffs ArcelorMittal Indiana Harbor and ArcelorMittal USA seek summary judgment in their favor on the claims in Counts I, II, and III of the Second Amended Complaint. The Court considers each count in turn.

### A. Count I–Negligence

Count I for negligence is brought by ArcelorMittal Indiana Harbor only. In the instant motion, ArcelorMittal Indiana Harbor seeks summary judgment in its favor on its negligence claim, arguing that it is undisputed that Amex Nooter caused the April 3, 2013 fire and ArcelorMittal Indiana Harbor's damages and that Korrie Griffith's actions were an unforeseeable intervening, superseding cause.

Despite having the burden of proof at trial, ArcelorMittal Indiana Harbor does not set out the elements of a negligence claim in its motion or its brief. To prevail on a claim of negligence under Indiana law, ArcelorMittal Indiana Harbor must prove: "(1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty; and (3) an injury to the plaintiff proximately caused by the breach." *Walters v. JS Aviation, Inc.*, 81 N.E.3d 1160, 1163 (Ind. Ct. App. 2017) (citing *Brown v. Buchmeier*, 994 N.E.2d 291, 294 (Ind. Ct. App. 2013)). "Summary judgment is generally inappropriate in negligence cases because issues of contributory negligence, causation, and reasonable care are fact sensitive and more appropriately left for the trier of fact." *Id*. (citing *Coffman v. PSI Energy, Inc.*, 815 N.E.2d 522, 527 (Ind. Ct. App. 2004)).

First, ArcelorMittal Indiana Harbor does not acknowledge in either its motion or brief that duty is an element of its negligence claim, does not cite any law regarding duty, and does not identify the duty Amex Nooter owed to ArcelorMittal Indiana Harbor. Because ArcelorMittal

Indiana Harbor has not met its burden on an element of its claim, the Court denies ArcelorMittal Indiana Harbor's Motion for Summary Judgment on its negligence claim in Count I. Whether a defendant owes a plaintiff a duty is a question of law to be decided by the Court, *see Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991); but ArcelorMittal Indiana Harbor has not offered any argument regarding duty for the Court's consideration.

Even if ArcelorMittal Indiana Harbor had identified the duty owed by Amex Nooter and assuming that Griffith's actions in removing the valve constituted a breach of that duty[4] and were a proximate cause of the fire and resulting damage, summary judgment would be denied because Amex Nooter has asserted an affirmative defense of contributory fault and has alleged sufficient facts in support to create a genuine issue of material fact as to causation. *See* (ECF 117, p. 28) ("Third Affirmative Defense, Comparative Fault – ArcelorMittal Indiana Harbor LLC"). The Indiana Comparative Fault Act provides that "any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable to the claimant's contributory fault, but does not bar recovery . . . ." Ind. Code § 34-51-2-5. The Act also provides that the "legal requirements of causal relation apply to: (1) fault as the basis for liability; and (2) contributory fault." Ind. Code § 34-51-2-3.

Under the Act, "a broad range of potentially causative conduct initially may be considered by the fact-finder." *Green v. Ford Motor Co.*, 942 N.E.2d 791, 795 (Ind. 2011). "'[T]he jury is first required to decide whether an actor's negligence was a proximate cause of the plaintiff's injury,"

---

[4] As Korrie Griffith's employer, Amex Nooter would be liable for Griffith's actions because it is undisputed that Griffith was acting within the scope of his employment at the time he removed the valve on April 3, 2013. *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008). However, based on Griffith's testimony, there are genuine issues of material fact regarding Korrie Griffith's actions in removing the valve that day, including his knowledge of the line pressure, whether the valve was already loose, whether the valve was already leaking, his purpose in attempting to tighten the valve, and his lack of knowledge of the salamander heater.

and "[w]hether or not proximate cause exists is primarily a question of foreseeability." *Estate of Pfafman v. Lancaster*, 67 N.E.3d 1150, 1162 (Ind. Ct. App. 2017) (quoting *Green*, 942 N.E.2d at 795 (quoting *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002))). "The fact-finder must evaluate whether the injury 'is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated.'" *Id*. (quoting *Green*, 942 N.E.2d at 795 (citations omitted)). However, "[t]he fact-finder may allocate as comparative fault only such fault that it finds to have been a proximate cause of the claimed injuries." *Id*. (quoting *Green*, 942 N.E.2d at 795). "Under comparative fault, the trier of fact can allocate fault to multiple contributing factors based on their relative factual causation, relative culpability, or some combination of both." *Id*. (quoting *City of Gary ex. rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1244 (Ind. 2003)).

In its response to the instant motion, Amex Nooter offers facts regarding ArcelorMittal Indiana Harbor's own alleged negligent acts, omissions, and failures prior to Korrie Griffith's work on April 3, 2013, sufficient to create a genuine issue of material fact on causation for trial. Two of Amex Nooter's expert witnesses, Ross V. Smith and Richard W. Parry, have offered expert opinions that ArcelorMittal failed to provide a safe work environment and that ArcelorMittal's failures are the "root cause" of the fire. *See Blasius v. Angel Auto., Inc.*, 839 F.3d 639 (7th Cir. 2016) (noting that expert witness testimony on causation may be used on a motion for summary judgment to help the party "get to the fact finder"). Smith opines, in part, that ArcelorMittal Indiana Harbor failed to provide complete and correct information regarding the cabinet gas system prior to the work being performed, did not provide Amex Nooter with an effective Energy Control Procedure for the Cabinet, failed to operate the Excess Gas Bleeder Pilot Ignitor System in the West Cabinet in

accordance with its own Operating/Instruction Manual, and failed to make Amex Nooter aware of hazardous conditions associated with the rebuild of the Cabinet. Smith also opines that ArcelorMittal Indiana Harbor's Energy Control Procedure to lock out the involved excess gas bleeder cabinet took precedence over any lock out/tag out program of Amex Nooter. Parry opines that ArcelorMittal Indiana Harbor is at fault for the April 3, 2013 fire. Parry opines that ArcelorMittal Indiana Harbor should have installed a header shutoff valve in the feed line to the H3/H4 ignitor cabinet, failed to maintain its high pressure natural gas system such that several parts of the system's critical shutoff valves could not be closed or when closed did not effectively block the flow of the high pressure gas, and failed to follow the accepted good engineering practice of using a "double block and bleed" isolation methodology, which resulted in the failure of the single shutoff valve that was utilized. And, Parry opines that the salamander heater should have been shut-off and moved to storage by ArcelorMittal Indiana Harbor a month before the scheduled outage.

Viewing the facts in the light most favorable to Amex Nooter, a reasonable jury could find, based on Korrie Griffith's testimony and the opinions of Amex Nooter's expert witnesses, that Griffith only removed the valve because it had come loose during the repairs inside the cabinet and was leaking and that he was trying to repair it and, thus, was not negligent, that ArcelorMittal Indiana Harbor was negligent by failing to lock out the pipe upstream from the valve, that ArcelorMittal Indiana Harbor was negligent by failing to remove the salamander heater from the worksite, and that a foreseeable consequence of a failure to properly isolate a gas line under repair is a fire. Alternatively, a reasonable jury could find that each party was negligent but that Griffith's action of removing the valve would not have resulted in the fire if ArcelorMittal Indiana Harbor had not been negligent in relation to the lock out of the pipe upstream from the valve and/or in failing

to remove the functioning salamander heater. A reasonable jury could find it foreseeable to ArcelorMittal Indiana Harbor that natural gas could leak from a valve during a repair to a natural gas line for any number of reasons, ranging from inadvertent damage as a result of other work on the same pipe (such as Griffith's work inside the Cabinet) to pipefitter error, and cause a fire.

In anticipation that Amex Nooter would assert its affirmative defense of comparative fault, ArcelorMittal Indiana Harbor argues in its Motion for Summary Judgment that "[a]ny alleged action/inaction on the part of AM Indiana Harbor as a cause of the fire is . . . cut off by the intervening, superseding cause doctrine" because of Korrie Griffith's unforeseeable conduct of removing a valve from a live gas line. (ECF 143, pp. 15, 16). In support, ArcelorMittal Indiana Harbor cites four cases addressing intervening cause; however, none of the cases addresses contributory negligence. (ECF 143, pp. 16-17) (citing *Arnold v. F.J. Hab., Inc.*, 745 N.E.2d 912, 917 (Ind. Ct. App. 2001); *Straley v. Kimberly*, 687 N.E.2d 360 (Ind. Ct. App. 1997); *Walker v. Jones*, 511 N.E.2d 507, 508 (Ind. Ct. App. 1987); *Crull v. Platt*, 471 N.E.2d 1211, 1213 (Ind. Ct. App. 1984)). Rather, in all four cases, the alleged tortfeasor defendant invokes the theory of intervening cause to cut off the defendant's liability based on a third party actor's negligence. ArcelorMittal Indiana Harbor does not cite any case in which intervening cause is used by a plaintiff to counter a defendant's assertion of the affirmative defense of the plaintiff's contributory fault.

In 2002, in *Control Techniques, Inc. v. Johnson*, the Indiana Supreme Court recognized that the doctrine of superseding or intervening causation "has long been a part of Indiana common law" that provides that "when a negligent act or omission is followed by a subsequent negligent act or omission so remote in time that it breaks the chain of causation, the original wrongdoer is relieved of liability." 762 N.E.2d at 107 (citing *Vernon v. Kroger Co.*, 712 N.E.2d 976, 981 (Ind. 1999)). The

court defined a "subsequent act" as "'superseding' when the harm resulting from the original negligent act 'could not have reasonably been foreseen by the original negligent actor.'" *Id.* The Indiana Supreme Court noted that, since the enactment of Indiana's Comparative Fault Act, the doctrine of superseding cause "has been viewed by some as subsumed in the Act, and by others as retaining continued viability." *Id.* at 108 (citing cases); *see also Estate of Pfafman*, 67 N.E.3d at 1157 (discussing this reasoning in *Control Techniques, Inc.*, 762 N.E.2d at 108). The Indiana Supreme Court then concluded that

> the doctrines of causation and foreseeability impose the same limitations on liability as the "superseding cause" doctrine. Causation limits a negligent actor's liability to foreseeable consequences. A superseding cause is, by definition, one that is not reasonably foreseeable. As a result, the doctrine in today's world adds nothing to the requirement of foreseeability that is not already inherent in the requirement of causation.

*Control Techniques, Inc.*, 762 N.E.2d at 108.

The jury will have to evaluate whether the fire and resulting damage "is a natural and probable consequence, which in light of the circumstances, should have been foreseen or anticipated" by both ArcelorMittal Indiana Harbor and Amex Nooter. *Estate of Pfafman*, 67 N.E.3d at 1157. This is not a case in which the apportionment of fault becomes a question of law for the court, which occurs only when "there is no dispute in the evidence and the factfinder is able to come to only one logical conclusion." *Robbins v. McCarthy*, 581 N.E.2d 929, 934 (Ind. Ct. App. 1991), *reh'g denied, trans. denied*. Based on the foregoing, the Court denies ArcelorMittal Indiana Harbor's Motion for Summary Judgment on the claim for negligence in Count I.

## B. Count III–Breach of Contract for Damages

Setting aside Count II to address last, the Court next considers Count III, which is brought only by ArcelorMittal Indiana Harbor for damages for Amex Nooter's breach of the Contractor Work Contract and specifically the breach of certain provisions of the AMUSA-102 General Terms and Conditions.

"The essential elements of a breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages." *Breeding v. Kye's Inc.*, 831 N.E.2d 188, 190-91 (Ind. Ct. App. 2005) (citing *Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship*, 768 N.E.2d 463 (Ind. Ct. App. 2002), *trans. denied*).

*1.     Controlling Contract Terms and Conditions*

As an initial matter, Amex Nooter argues that there is a genuine issue of material fact as to which "Terms and Conditions" apply to certain aspects of this lawsuit. Both parties appear to agree that the Contractor Work Contract is the operative contract. However, ArcelorMittal contends that the AMUSA-102 General Terms and Conditions govern, whereas Amex Nooter argues that the AMUSA-102 Master Contract was materially changed, modified, and/or superseded by Purchase Orders Nos. N489391 and N489392 ("Purchase Orders"), which provide that the AMUSA-100 Terms and Conditions govern.

When the language of a contract is unambiguous, its language is "conclusive upon the parties and upon the courts." *Boonville Convalescent Ctr., Inc. v. Cloverleaf Healthcare Servs.*, 834 N.E.2d 1116, 1121 (Ind. Ct. App. 2005). In this case, the Contractor Work Contract is unambiguous; the AMUSA-102 General Terms and Conditions apply, not the AMUSA-100 Terms and Conditions.

The AMUSA-102 Master Agreement provides that the Contractor Work Contract consists of the Safety Handbook, the AMUSA-102 General Terms and Conditions, and the Purchase Orders. (ECF 143-2, Execution Sheet ¶ 3). Amex Nooter is correct that each of the Purchase Orders indicates that the "AMUSA-100 Terms and Conditions will apply to this Purchase Order." (ECF 143-3, pp. 2,4). However, the AMUSA-102 General Terms and Conditions provides that "[a]ny reference to Owner's or Contractor's general terms and conditions of purchase, sale or performance *in any Purchase Order* or any communication or document issued or delivered by Contractor (including, not limited to acknowledgments or invoices) *shall not be operative, binding or effective*." (ECF 143-2, General Terms and Conditions § 2(a)) (emphasis added). Thus, the reference to the AMUSA-100 Terms and Conditions in the Purchase Orders is not operative, binding, or effective.

Moreover, to the extent that this could be perceived as a discrepancy between the AMUSA-102 General Terms and Conditions and the Purchase Orders, both of which are parts of the Contractor Work Contract, the AMUSA-102 Master Agreement provides that, in the event of any inconsistencies or discrepancies among any parts of the Contractor Work Contract, the Safety Handbook takes precedence over the AMUSA-102 General Terms and Conditions, *the AMUSA-102 General Terms and Conditions takes precedence over the Purchase Order*, and the Purchase Order takes precedence over the Other Contractual Documents. (ECF 143-2, Execution Sheet ¶ 5) (emphasis added).

Also, the AMUSA-102 General Terms and Conditions provides that the Contractor Work Contract represents the entire agreement of the parties and is binding unless a modification is made in writing that both states that it amends the Contractor Work Contract and is signed by an authorized representative of both the Owner and the Contractor. (ECF 143-2, General Terms and

Conditions § 2(a)). There is no such written document in this case. Therefore the AMUSA-100 Terms and Conditions are not in effect, and the AMUSA-102 General Terms and Conditions are controlling.

### 2.    *Breach of Contract–Unsafe Work*

First, ArcelorMittal Indiana Harbor argues in its Motion for Summary Judgment that Amex Nooter breached the Contractor Work Contract, which required Amex Nooter to perform its work safely, when Korrie Griffith intentionally removed the valve from a live gas line, causing the fire. "A party breaches a contract when it fails to perform all of the obligations that it has agreed to undertake." *Breeding*, 831 N.E.2d at 191 (Ind. Ct. App. 2005) (citing *Worrell v. WLT Corp.*, 653 N.E.2d 1054, 1057 (Ind. Ct. App. 1995), *trans. denied*). The contract provision regarding safety that ArcelorMittal Indiana Harbor references in support of this argument is AMUSA-102 General Terms and Conditions Section 3, which ArcelorMittal only references generally in a parenthetical citation. However, Section 3 contains eight subsections lettered (a) through (h), (ECF 143-2, General Terms and Conditions, § 3(a)-(h)); in its analysis, ArcelorMittal Indiana Harbor does not identify which provisions it is attempting to prove Amex Nooter breached. (ECF 143, pp. 19-22). In its Statement of Undisputed Material Facts, ArcelorMittal Indiana Harbor cites Sections 3(a), 3(b), and 3(c). Therefore, the Court considers those sections to be the basis of this breach of contract claim.

Section 3(a) of the AMUSA-102 General Terms and Conditions requires Amex Nooter to comply with the "safety, health and environmental rules specified by Applicable Laws or the Safety Handbook or other rules of Owner especially applicable at the Job Site" during the performance of the Contractor Work Contract. (ECF 143-2, § 3(b)). Section 3(b) provides that "[d]isregard for, or multiple or continued violations of, the Safety Handbook or any other applicable safety rules shall

be deemed to be a material breach of this Contractor Work Contract." *Id.* at § 3(b). Section 3(c) requires Amex Nooter to "control access to the Job Site and be responsible for all persons and Work at the Job Site." *Id.* at § 3(c). Nowhere does ArcelorMittal Indiana Harbor explain how Griffith's action of removing the valve constituted disregard for the Safety Handbook or "applicable safety rules." ArcelorMittal Indiana Harbor does not reference either the Safety Handbook or "applicable safety rules" in its analysis. Therefore, ArcelorMittal Indiana Harbor has not met its burden of demonstrating that Amex Nooter breached Sections 3(a), 3(b), and 3(c) of the AMUSA-102 General Terms and Conditions. ArcelorMittal Indiana Harbor has not offered any other basis for its breach of contract claim based on Amex Nooter's performance of the work on April 3, 2013. The Court denies the Motion for Summary Judgment on the claim in Count III for breach of contract based on Section 3 of AMUSA-102 General Terms and Conditions. As a result, the Court does not reach ArcelorMittal Indiana Harbor's argument regarding causation. *See* (ECF 143, p. 20).

3.    *Breach of Contract–Failure to Reimburse*

ArcelorMittal Indiana Harbor also argues in the Motion for Summary Judgment that Amex Nooter breached the Contractor Work Contract when it refused to reimburse ArcelorMittal Indiana Harbor for the $3,244,292.83 in property damage and costs ArcelorMittal Indiana Harbor sustained due to Amex Nooter's negligence, citing Section 22(a) of the AMUSA-102 General Terms and Conditions.

Section 22(a) of the AMUSA-102 provides

Contractor shall . . . indemnify, defend and save harmless the Owner's Indemnitees *from and against* any and all Claims made by any person or persons by reason of any act or omission on the part of Contractor or any of its Subcontractors or any employee, agent or invitee of Contractor or any of its Subcontractors, including any breach or alleged breach of any statutory duty that is to be performed by Contractor under this Contractor Work Contract but is, or may be the duty of, any of the Owner

36

Indemnitees under Applicable Laws. Notwithstanding the foregoing obligations in this Section 22(a), Contractor shall not be required to indemnify and save harmless Owner's Indemnitees from Claims that are finally determined by a court with jurisdiction to have been caused solely by the negligence or willful misconduct of Owner's Indemnitees; provided, however, that the condition or operation of Owner's Indemnitees' production and manufacturing facilities in the normal course of Owner's Indemnitees' businesses shall be deemed not to be negligence or willful misconduct.

(ECF 143-2, General Terms and Conditions § 22(a)) (emphasis added). As explained above, Amex Nooter is the "Contractor," and ArcelorMittal Indiana Harbor is the "Owner Indemnitees."

The AMUSA-102 further defines "Claims" as:

Any and all claims, actions, suits, demands, arbitrations, and causes of actions or other similar activity made, filed, done or attempted or submitted for or on account of any actual or alleged liabilities, losses, damages, fines, penalties, awards, judgments, decrees, orders, holdings, determinations, opinions, costs and expenses of every kind and amount whatsoever (including without limitation reasonable attorney's fees), on account of or as a result of any actual or alleged loss of, damage to or defect in property or any actual or alleged disease, illness or injury, including death, of one or more persons.

*Id*. at § 1(iii).

ArcelorMittal Indiana Harbor argues in its brief that, under these provisions, its January 9, 2014 demand to Amex Nooter for reimbursement constitutes a claim under Section 22(a) of the AMUSA-102. (ECF 143, p. 21); (ECF 143-13) (January 9, 2014 demand letter). And, ArcelorMittal Indiana Harbor argues that, upon receipt of that letter, Amex Nooter was required to reimburse ArcelorMittal Indiana Harbor for the $3,244.292.83 in property damages and costs it sustained due to Amex Nooter's negligence.

Based on the plain language of these contract provisions, Amex Nooter is required to indemnify, defend, and save harmless ArcelorMittal Indiana Harbor from claims made by others against ArcelorMittal Indiana Harbor. For example, as discussed below in the context of Count II,

Section 22(a) applies to ArcelorMittal USA's claim against Amex Nooter for defense in the lawsuit filed by Robert Swimline against ArcelorMittal USA. Section 22(a) does not apply to ArcelorMittal Indiana Harbor's own negligence claim brought directly against Amex Nooter. Thus, the Court denies ArcelorMittal's Motion for Summary Judgment on the claim in Count III for breach of contract based on Section 22 of the AMUSA-102 General Terms and Conditions.

### C. Count II–Breach of Contract for Defense

Count II for breach of contract is brought by both ArcelorMittal Indiana Harbor and ArcelorMittal USA under Section 22(a) of the AMUSA-102 General Terms and Conditions, alleging that Amex Nooter failed to defend "ArcelorMittal" in the Robert Swimline litigation against "ArcelorMittal" that seeks compensation for injuries Swimline sustained on April 3, 2013.

As set out in the Material Facts and in the previous section, Section 22(a) of the AMUSA-102 General Terms and Conditions provides:

> Contractor shall . . . indemnify, defend and save harmless the *Owner's Indemnitees from and against* any and all Claims made by any person or persons by reason of any act or omission on the part of Contractor or any of its Subcontractors or any employee, agent or invitee of Contractor or any of its Subcontractors, including any breach or alleged breach of any statutory duty that is to be performed by Contractor under this Contractor Work Contract but is, or may be the duty of, any of the Owner Indemnitees under Applicable Laws. Notwithstanding the foregoing obligations in this Section 22(a), Contractor shall not be required to indemnify and save harmless Owner's Indemnitees from Claims that are finally determined by a court with jurisdiction to have been caused solely by the negligence or willful misconduct of Owner's Indemnitees; provided, however, that the condition or operation of Owner's Indemnitees' production and manufacturing facilities in the normal course of Owner's Indemnitees' businesses shall be deemed not to be negligence or willful misconduct.

(ECF 143-2, General Terms and Conditions § 22(a)) (emphasis added). In the event of such a claim, the Contractor is required to immediately, upon demand, assume the defense of any action at law brought against the Owner's Indemnitees. *Id.* at § 22(b).

The AMUSA-102 further defines "Claims" as:

Any and all claims, actions, suits, demands, arbitrations, and causes of actions or other similar activity made, filed, done or attempted or submitted for or on account of any actual or alleged liabilities, losses, damages, fines, penalties, awards, judgments, decrees, orders, holdings, determinations, opinions, costs and expenses of every kind and amount whatsoever (including without limitation reasonable attorney's fees), on account of or as a result of any actual or alleged loss of, damage to or defect in property or any actual or alleged disease, illness or injury, including death, of one or more persons.

*Id*. at § 1(iii).

The "Contractor" is Amex Nooter. *See* (ECF 143-2, General Terms and Conditions § 1(viii); Execution Sheet). The "Owner's Indemnitees" is both ArcelorMittal Indiana Harbor *and* ArcelorMittal USA because (1) "Owner's Indemnitees" means "Owner" and "all Owner Companies," *id*. at § 1(xiv); (2) "'Owner' means the Owner Company issuing the Purchase Order applicable to this Contractor Work Contract," *id*. at § 1(x), and ArcelorMittal Indiana Harbor issued the Purchase Orders, (ECF 143-3); and (3) "Owner Companies" includes the "Owner Signatory," (ECF 143-2, General Terms and Conditions § 1(xi)), and ArcelorMittal USA is the "Owner Signatory," (ECF 143-2, Execution Sheet).

Therefore, Amex Nooter is required to "immediately, upon demand, assume the defense of any action at law brought against ArcelorMittal Indiana Harbor or ArcelorMittal USA." Indiana law provides that an "'insurer's duty to defend is broader than its duty to indemnify.'" *Barnard*, 25 N.E.3d at 760 (quoting *Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E.2d 192, 198 (Ind. Ct. App. 2005)). A court "will 'determine the insurer's duty to defend from the allegations contained within the complaint and from those facts known or ascertainable by the insurer after reasonable investigation.'" *Id*. (same); *see also Transamerica Ins. Servs. v. Kopko*, 570 N.E.2d 1283, 1385 (Ind. 1991) ("The duty to defend is determined solely by the nature of the complaint.").

On December 10, 2013, ArcelorMittal USA tendered a general defense, without reference to any specific claim, action, suit, demand, arbitration, or cause of action. (ECF 143-14) (tender letter); *see also* (ECF 143-2, §§ 1(iii), 22(a)) (definition of "claim" and duty to defend provision). Both the Second Amended Complaint in this case, as well as the instant Motion for Summary Judgment, refer to ArcelorMittal Indiana Harbor and ArcelorMittal USA jointly as "ArcelorMittal" (just as this Court does). And, both documents represent that "ArcelorMittal" (meaning both ArcelorMittal Indiana Harbor and ArcelorMittal USA) tendered a defense on December 10, 2013. (ECF 116, pp. 1, 11 (¶ 59 )); (ECF 143, pp. 1, 23). However, the December 10, 2013 tender of defense letter is written on behalf of ArcelorMittal USA only.

On August 1, 2014, Robert Swimline filed a complaint against ArcelorMittal Indiana Harbor, only, in the Lake County, Indiana, Circuit Court, for his injuries arising out of the April 3, 2013 fire. The Second Amended Complaint in the instant case incorrectly represents that Swimline's August 1, 2014 state court complaint was brought against both ArcelorMittal Indiana Harbor *and* ArcelorMittal USA.

In the Second Amended Complaint in this case, there is a reference to a "renewed" tender of defense on August 28, 2014, by "ArcelorMittal." (ECF 116, ¶ 59). And, the April 20, 2015 letter from Amex Nooter's insurance company accepting the defense references the August 28, 2014 "renewed" tender of defense. (ECF 143-16). Although the August 28, 2014 renewed tender of defense itself is not attached as an exhibit to the instant motion, viewed in the light most favorable to Amex Nooter, the reasonable inference is that it was ArcelorMittal USA that "renewed" its December 10, 2013 tender of defense.

On September 19, 2014, ArcelorMittal Indiana Harbor removed Robert Swimline's state court complaint to this Court. On April 2, 2015, this Court granted Swimline's motion to amend the complaint to add defendants ArcelorMittal USA, Frank Peters, and Amex Nooter. Because the addition of Frank Peters destroyed diversity jurisdiction, the Court remanded the case to state court.

On April 20, 2015, Amex Nooter and its insurer accepted "ArcelorMittal's" tender demand in relation to the Swimline litigation, referencing the December 10, 2013 tender of defense and the August 28, 2014 renewed tender of defense. The heading of the letter identifies "Your Client" as "ArcelorMittal USA, LLC." (ECF 153-16).

On January 22, 2016, counsel for ArcelorMittal wrote a two-sentence email letter: "We still haven't received payment for defense costs incurred from date of tender to acceptance. Can you please check on the status of payment and advise as to when we can expect payment." (ECF 143-17).

In the instant Motion for Summary Judgment, "ArcelorMittal" seeks reimbursement of defense costs beginning on December 10, 2013, the original date of the general tender of defense by ArcelorMittal USA, through April 20, 2015, the date of acceptance of the tender of defense by Amex Nooter and its insurance company. First, ArcelorMittal Indiana Harbor has not demonstrated that it tendered a defense to Amex Nooter; the only evidence of record is that ArcelorMittal USA tendered its defense on December 10, 2013, and renewed the tender of defense on August 28, 2014. Therefore, the Court considers this claim only as to ArcelorMittal USA.

ArcelorMittal USA argues that, under Indiana law, it is entitled to reimbursement of defense costs beginning on the date of tender of the defense, citing *Barnard v. Menard, Inc.*, 25 N.E.3d 750, 761 (Ind. Ct. App. 2015). *See* (ECF 143, p. 23). In *Barnard*, the court found that the insurance

company had a duty to defend based on the language of the policy and the allegations of the injured party's complaint, affirming the grant of summary judgment in favor of the insureds and against the insurance company. 25 N.E.3d at 760. In the conclusion of the opinion, the court ordered that the insureds "are entitled to reimbursement for the defense costs they have incurred *since the date they tendered defense* to Capitol," *id*. at 761 (emphasis added), which is the language quoted by ArcelorMittal USA in the instant motion. However, in *Barnard*, the injured plaintiff brought a lawsuit against the insureds, and only *then* did the insureds tender their defense by bringing a third-party complaint against the insurer to invoke the insurer's duty to defend. *Id*. at 752. Thus, *Barnard* does not address ArcelorMittal USA's assertion that it is entitled to the costs of defense prior to the lawsuit by Swimline being filed against ArcelorMittal USA on April 2, 2015.

In the context of an insured failing to comply with the insurance policy's notice requirement, the Indiana Supreme Court found that "an insurer cannot defend a claim of which it has no knowledge." *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1273 (Ind. 2009). In that case, the insurance company did not have a duty to defend until the insured complied with the policy's notice requirement. *Id*. In the instant case, no "claim" was brought against ArcelorMittal USA, the entity that made a defense demand on December 10, 2013, until the Amended Complaint was filed in the Swimline litigation on April 2, 2015, adding ArcelorMittal USA as a defendant. Thus, Amex Nooter and its insurance company could not have determined whether there was a duty to defend ArcelorMittal USA until the filing of Swimline's Amended Complaint.

In its reply brief, ArcelorMittal USA cites *Trisler v. Indiana Insurance Co.* for its statement that the determination of an insurer's duty to defend is not limited solely to what is alleged in a plaintiff's complaint but also considers "those facts known to or ascertainable by the insurer after

reasonable investigation." (ECF 168, p. 14 (citing *Trisler v. Ind. Ins. Co.*, 575 N.E.2d 1021, 1022 (Ind. Ct. App. 1991)). While this is a correct statement of the law, *Trisler* does not address the question of whether the costs of defense incurred prior to the filing of litigation must be reimbursed. In *Trisler*, the question of whether the insurance company owed a duty of defense arose *after* claims were filed against the insured. *Trisler*, 575 N.E.2d at 1022.

The Court notes that there is no factual showing of what alleged defense costs Amex Nooter has not reimbursed ArcelorMittal USA, what defense costs ArcelorMittal USA incurred prior to Swimline bringing suit against it on April 2, 2015, or what Amex Nooter has reimbursed ArcelorMittal USA in relation to the claims brought against ArcelorMittal USA on April 2, 2015. There is no allegation that Amex Nooter has not paid ArcelorMittal USA's defense costs from the date of acceptance—April 20, 2015—forward.

In its reply brief, ArcelorMittal USA changes the basis of this claim. In addition to arguing for defense costs beginning on December 10, 2013, through April 20, 2015, ArcelorMittal USA also argues, for the first time, for defense costs beginning August 1, 2014, based on the date Robert Swimline filed his state court complaint. First, because ArcelorMittal USA did not make this argument in its opening motion, it is waived for purposes of this motion. Second, ArcelorMittal USA has failed to address the fact that Swimline's August 1, 2014 state court complaint was filed against ArcelorMittal Indiana Harbor only and that Swimline did not bring a claim against ArcelorMittal USA until his Amended Complaint on April 2, 2015.

Based on the foregoing, neither ArcelorMittal Indiana Harbor nor ArcelorMittal USA has met its burden of proving this claim, and the Court denies the Motion for Summary Judgment on Count II.

**CONCLUSION**

Based on the foregoing, the Court hereby **DENIES** Plaintiffs' Motion for Summary Judgment [DE 142]. The Court **REAFFIRMS** the January 5, 2018 final pretrial conference, and the February 5, 2018 jury trial setting.

SO ORDERED this 3rd day of January, 2018.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT